DORRITT VAN DEUSEN WOODHOUSE *v.* LORENZO E. WOODHOUSE
ET UX.

October Term, 1925.

Present:   WATSON, C. J., POWERS, TAYLOR, SLACK, and BUTLER, JJ.

Opinion filed October 7, 1925.

*Husband and Wife—Parental Rights after Marriage of Child—
Alienation of Affections—Malice Essential Element—Bur-
den of Showing Malice—Presumption—Inferred Malice—
Determination of Sufficiency of Evidence to Support Ver-
dict—Inferences from Evidence—View of Evidence on Mo-
tion for Directed Verdict—Test for Determining Whether
Evidence Shows Alienation—Jury Question—Loss of Con-
sortium—Loss of Service and Pecuniary Loss—Separation
or Physical Absence of Spouse—Liability Determined by
Controlling Cause of Alienation—Whether Acts and Con-
duct Defendants Controlling Cause Held for Jury—Lia-
bility for Partial Alienation—Striking Out Part of An-
swer—Exclusion of Question and Answer Dependent upon
Other Testimony Stricken Out—Question Not raised Be-
low—False Reference by Striking Out Preceding Question
—Answer Responsive, but Broader Than Question—Harm-
less Error—Order of Conducting Examination—Striking
Out Evasive Answer of Adverse Witness and Requiring
Direct Answer—Impeachment by Inconsistent Statement—
Remoteness—Proof of Agency—Exception to Evidence Sub-
stantially Same as Previous Answer Received without Ob-
jection—Certain Evidence Held Material—Burden of Show-
ing Error on Excepting Party—Evidence of Pregnancy of
Plaintiff at Time of Marriage and Submission to Criminal
Operation Shortly after Wedding Held Admissible—Neces-
sity of Request for Instructions under Claimed Error—
Evidence of Husband's Flirtation with Another Woman Ad-
missible on Alienation—Evidence Tending to Show Aliena-
tion and Loss of Consortium—Claimed Error Not Sufficient-
ly Specified—Interview of Plaintiff's Husband with An-
other Woman, Relating to Plaintiff's Divorce Held Mate-
rial—Objection on Ground Immateriality Alone—Erroneous*

*Admission Testimony Cured by Subsequent Admission
Similar Testimony without Objection—Evidence Tending to
Show Relation of Defendant, Plaintiff's Husband, and An-
other Woman—Evidence of Rubber Stamp Procured by
Husband's Father to Forward Mail to Husband Admissible
—Cross-Examination of Party—Damages—Evidence of In-
jurious Effect of Husband's Absence—Mental and Physical
Suffering—Abuse of Discretion—Necessity of Stating Ob-
jection Below—Evidence of Husband's State · of Mind
Caused by Defendants' Conduct—Question Held Not to
Assume Matter Not in Case—Evidence Relating to Effect
on Plaintiff's Husband of Defendants' Adverse Attitude to
Plaintiff—Evidence Relating to Disinheritance of Plaintiff's
Husband—Disinheritance as Actionable Wrong—Presump-
tion Relating to Evidence Admitted Conditionally—Evi-
dence Tending to Show Relations and Mutual Affection of
Plaintiff and Husband—Evidence Material as Explaining
Other Testimony—Inadequate Briefing—Evidence Tending
to Show Interference with Plaintiff's Credit—Scope of Cir-
cumstantial Evidence—Wealth of Defendants Admissible
on Question of Alienation—Admissibility on Exemplary ·
Damages, Where Wealth of One Defendant in Excess of
Other—Damages against Joint Tort-Feasors—Liability of
Husband and Wife as Joint Tort-Feasors—Liability of Joint
Tort-Feasors Several—Incumbent upon Plaintiff to Show
Means of Defendants on Exemplary Damages—Cross-Exam-
ination—Discretion of Court in Examination of Witnesses
—Hypothetical Questions—Arguments of Counsel—Excep-
tions to Charge—General Exceptions—Where Claimed Lan-
guage Not Used by Court—Exception Not Sufficiently Spe-
cific—Motive Actuating Alienation—Charge Held Applica-
ble to Evidence—Limitations of Review—Presumptions on
Review—Prejudicial Argument Though Unexcepted to as
Basis of Motion To Set Verdict Aside—Such Motion Ad-
dressed to Trial Court's Discretion—Showing Required to
Set Verdict Aside—Size of Verdict as Basis for Setting
Aside—Exemplary Damages Discretionary with Jury—
Consideration of Evidence on Motion to Set Aside Verdict—
Demonstration of Spectators as Cause—Power to Grant and
Fixing Amount of Remittitur—When Verdict Will Not Be
Disturbed—Nature of Exemplary Damages—Discretion of*

*Court in Granting Remittitur—Rules Governing Admission
and Rejection of Evidence on Petition for New Trial—Re-
freshing Recollection of Witness—Application for New Trial
Addressed to Court's Discretion—Matters Governing Its
Grant or Refusal—Petitioner Has Burden of Establishing
Claimed Misconduct—Misconduct of Juror.*

1. Parental interest not being interrupted by children's marriage, parents have a right thereafter to continue their solicitude and parental care, and to be protected in the continuance of such interest.

2. In view of natural solicitude of normal parent for his child's welfare, law presumes that parent, in his influence, association, and conduct with child, is acting within his rights, and will not infer malice from mere fact of parental interference in marital relations of child, in absence of proof that interference was without just cause or excuse.

3. Parent is not liable to spouse of his child for causing their separation, if counsel given and persuasion used by him are such as he fairly and honestly considers to be called for by child's best interest, so that acts are in good faith and without malice.

4. While parents have superior right of interference in marital relations of child, and may justify such interference for causes which would be no justification in favor of strangers, relation of parent and child does not justify deliberate attempt without cause to bring about separation of child and spouse, and when done without justifiable cause parent is liable in tort, like any other person.

5. Malice is generally, if not always, deemed an essential element of actions for alienation.

6. In action against husband's parents for alienation of his affections, plaintiff has burden of showing that conduct complained of was actuated by malicious motives.

7. In such action, presumption that parents were acting from natural solicitude for child and not from malice, is not to be weighed as evidence, function of such presumption being locative and not probative.

8. In such action, malice implies no more than the intentional doing of a wrongful act without just cause or excuse, and ex-

press malice need not be proved, but malice may be inferred from conduct, as in other cases where it is in issue.

9. Sufficiency of evidence to support verdict is to be determined from the evidence considered as a whole, and not by treating it piecemeal and weighing each piece of evidence as though standing alone.

10. Fair inferences from evidence based upon the natural course of events and of human experience are as much evidence as the principal facts from which the deductions flow.

11. Supreme Court in reviewing exception to overruling of defendants' motion for a directed verdict is confined to determining whether there is evidence tending to support material allegations of complaint, and where evidence is conflicting may consider only such as supports the verdict, and must accept all reasonable inferences that may be drawn therefrom most favorable to plaintiff.

12. In action for alienation of affections, it is not essential to a recovery that evidence should support all of allegations of means employed to accomplish the alienation, the test being whether evidence supports the ultimate facts alleged in complaint.

13. In action against husband's parents for alienation of his affections, evidence *held* to make matter of liability question for jury.

14. Gist of action for alienation of husband's affections is loss of consortium of husband, which includes his affection, his conjugal society, and his aid and cooperation in every conjugal relation.

15. It is not essential to maintenance of action for alienation of husband's affections that there should be any loss of service or any pecuniary loss whatever.

16. In action against husband's parents for alienation of his affections, actionable character of injury is not dependent upon separation or physical absence of husband; but wrong could be inflicted though plaintiff was living with her husband at the time.

17. To confer right of action for alienation of husband's affections, conduct of party charged therewith need not be sole cause of alienation or separation, but it is sufficient if controlling cause.

18. Evidence *held* to make jury question whether acts and conduct of defendants were controlling cause of plaintiff's loss of con-

sortium, and not to show conclusively that such loss was due to plaintiff's voluntary act.

19. Liability may be incurred for partial alienation of husband's affections.

20. Striking out that part of answer which brought in contents of letter, and permitting remainder to stand, *held* proper where part excluded did not materially affect relevant part of answer.

21. Inadmissible part of an answer may be excluded, provided meaning of part left is not changed.

22. In action against husband's parents for alienation of his affections, where husband had testified that he had told plaintiff that his parents had threatened to disinherit him, but that such was not the fact, and in response to question, "Were you lying to her?" answered, "I was," *held* that where testimony leading up to quoted question and answer was excluded on defendants' objection, the court correctly excluded that question and answer also, against defendants' claim that it should stand.

23. Supreme Court will not consider question of error not raised by objection in court below.

24. Striking out certain question and answer *held* not thereby to give succeeding questions "a false reference."

25. In action against husband's parents for alienation of his affections, where husband having testified that he had never resented meddling of his parents, was then asked whether he resented the attitude his parents had taken toward his marriage, and replied that he thought it was unjust, *held* that striking out such last answer did not alter reference contained in question immediately following, asking whether he had tried to express his resentment to them.

26. Where answer was responsive to, but broader than question, overruling of motion to strike out answer as not responsive *held* without error.

27. Admission of testimony over objection, where witness had already testified to the same thing without objection, if error, *held* harmless.

28. Order or manner of conducting examination of witnesses is so far a matter of discretion with trial court that it will be reviewed only for abuse of discretion.

29. Where court properly found witness to be adverse, it was not abuse of discretion for court to strike out answer considered

evasive and require direct answer, "yes or no," opportunity to explain· or qualify his answers not being denied.

30. Statement for purposes of impeachment need not be coextensive with previous statement, it being enough if they are inconsistent.

31. Question of remoteness is matter of discretion for trial court and not reviewable except for abuse of discretion.

32. Proof of agency need not be direct, but may be shown by acts of parties.

33. Exception to evidence substantially the same as an answer already given without objection does not present reversible error.

34. In action against husband's parents for alienation of his affections, where plaintiff claimed that defendants participated in having certain bills contracted by her on her husband's credit in Vermont sent to him in Nevada by a circuitous route, for purpose of concealing his whereabouts from her, question asked bank employee as to whether while working at bank he was not receiving bills against husband, to which he replied, "I saw bills go through the bank," *held* material.

35. In such action, question asked husband whether his wife wasn't in tears most of way on certain trip, to which he replied that she cried a little after their arrival at destination, but that he didn't remember that she was tearful while going there, *held* admissible against objection that there was nothing to connect defendants' therewith, the circumstances being such as to make jury question whether grief was due to alienation of husband's affections, in which event evidence was material on question of damages.

36. In such action, where defendants claimed that plaintiff did not make promised connection with respect to testimony admitted over objection that evidence did not connect defendants with acts in question, mere assertion in brief of want of such evidence does not answer requirement that burden of showing error is on excepting party.

37. In such action, evidence that wife, who was pregnant at time of marriage by her husband, submitted to criminal operation a short time after wedding at his request, *held* admissible against objection that what she did had no relation to defendants, as the admissibility of such evidence was not de-

pendent upon defendants having anything to do with affair, but was admissible on several other grounds.

38. In such action, where court, over objection that it was immaterial, first admitted envelope bearing special delivery postage, addressed to husband at defendants' city address, which was forwarded to husband and returned, offered in connection with plaintiff's testimony to show by its refusal and return that husband was concealing himself from her, but subsequently, and before exhibit was shown to jury, court reversed ruling and excluded envelope, defendants' contention that claimed error was not thus cured without instructions to jury to disregard claims made when envelope was offered, *held* untenable, in absence of request for any such instruction.

39. In such action, evidence of husband's flirtation with another woman *held* admissible as tending to show alienation.

40. In such action, while causal connection between acts of defendants and alienation must be shown, admissibility of evidence tending to show alienation and loss of consortium is not dependent upon defendants' knowledge of or connection therewith.

41. Claimed error, not referred to in specification of errors relied upon by excepting party and made part of record, *held* not before Supreme Court for review.

42. In action against husband's parents for alienation of his affections, testimony of woman with whom husband had carried on flirtation that she had an interview with her brother and plaintiff's husband, some time after meeting plaintiff, at which subject of plaintiff's divorce was discussed, *held* material on question of alienation.

43. To sustain objection on ground of immateriality alone, it must appear that evidence is clearly irrelevant.

44. Admission of testimony over objection, if error, *held* harmless where similar questions and answers were subsequently received without objection.

45. In action against husband's parents for alienation of his affections, in which plaintiff was undertaking to show by circumstantial evidence the true relation between defendants, her husband, and another woman with whom he had been carrying on a flirtation, evidence that he had heard from such woman, respecting some proposal referred to in his testimony in plaintiff's divorce proceedings, a week or ten days there-

after, *held* admissible, not to show event referred to, but to show that each was keeping others informed.

46. In such action, where plaintiff claimed that her husband went to another city for permanent stay, as part of plan to bring about alienation, and the defendants denied all connection with such change, and particularly that they had knowledge that he intended to remain in such other city, evidence that husband's father had a rubber stamp prepared for use in forwarding mail to his son in such city afforded a fair inference that the father understood his son's residence was to be somewhat of a permanent nature, and was admissible to connect the father with his son's presence in such city.

47. In such action, cross-examination of one of defendants as to confidential and friendly relations of plaintiff's husband with such defendant's cousin, who had introduced plaintiff's husband to another woman and knew something of their subsequent intimacy, *held* not improper, witness being a party.

48. In such action, testimony of plaintiff as to injurious effect upon her health of her husband's absence, of her inability to find him, and of her lack of knowledge where he was, *held* admissible on question of damages.

49. In action for alienation, defendants found to be controlling cause of estrangement are liable for consequential damages of whatever nature, including mental and physical suffering occasioned by alienation.

50. Where excepting party failed to show injury by refusal of court to strike out evidence admitted without objection, but objected to immediately after answer, *held* that there was no abuse of discretion requiring reversal.

51. Supreme Court need not consider exceptions to evidence, where record fails to show that any ground of objection was assigned below.

52. In action against husband's parents for alienation of his affections, question asked husband as to whether he considered it hopeless to try to get them to recognize his wife as a member of the family, answered in the affirmative, *held* proper against objection that it called for opinion of witness without giving anything upon which opinion was based, as question called for witness' state of mind, and was direct evidence of effect of defendants' conduct.

53. In such action, questions asked husband on cross-examination,

alluding to certain negotiations, *held* not erroneous as assuming existence of negotiations not in case, there being evidence in case from which their nature and defendants' connection therewith fairly appeared.

54. In such action, question asked husband, after he had testified to continued adverse attitude of his father, as to whether at certain time he had not become convinced that he must either find an independent means of support for himself and wife or separate from her, to which he replied that the question had not come up for consideration, was not objectionable as immaterial, it being apparent that an affirmative answer would have been material.

55. In such action, evidence of statement of husband's father to the effect that he had nothing more to do with his son, that he had disinherited him on account of his escapade with plaintiff, but hoped that he might be reinstated at some future time, was admissible against objection that it was immaterial, although made after alienation had been accomplished.

56. Disinheritance for malicious purpose of alienating son's affections is an actionable wrong.

57. Where evidence was admitted, in case having several codefendants, over objection that it was not admissible against one of them unless connected up, and court said that if no connection was made matter could be taken care of later, in absence of showing to the contrary it will be presumed that connection was made or evidence properly restricted.

58. In action against husband's parents for alienation of his affections, after husband had testified that while he was sick in hospital, his mother came into room where he and plaintiff were, and upon seeing plaintiff turned her back on plaintiff and abruptly left room without speaking to her, question concerning whether he felt forced to take a position in favor of one and against the other, *held* not objectionable as immaterial and incompetent.

59. In such action, testimony of plaintiff that before her marriage she gave up plans she had made to do settlement work at husband's request was admissible to characterize their relations and to show mutual affections.

60. In such action, letter to plaintiff from husband before their marriage, of an affectionate character, containing admonition about her going to certain place, held admissible to show his affec-

tion, and evidence that she had cancelled dinner engagement at place referred to in letter was admissible to meet any possible inference from such admonition that she was doing contrary to his wishes in that regard.

61. Where letter written to plaintiff by husband before marriage had been admitted for purpose of showing his affection for plaintiff, and such letter made reference to congratulations extended to both of them by certain person named therein, testimony of plaintiff that their engagement had been announced to such person was admissible, against objection that it was immaterial, to enable complete understanding of matters contained in letter.

62. In action against husband's parents for alienation of his affections, where defendants claimed that plaintiff did not accompany husband on a trip to Florida with them, because of a previous arrangement for a visit by plaintiff to Louisville, Kentucky, testimony by her that she went to Louisville to care for some sick relations after her husband had gone to Florida, was admissible against objection that it was immaterial, the reason why she went to Louisville being a material issue in case.

63. Merely referring to exception taken does not constitute adequate briefing.

64. In action against husband's parents for alienation of his affections, where plaintiff was seeking to show interference by husband's father with her credit at store at which she had account in husband's name, evidence that husband's father and proprietor of such store were present at certain bank directors' meeting, while husband was out of city, and that immediately thereafter she was notified that her credit at such store was terminated, *held* admissible as a circumstance tending to prove the ultimate fact.

65. Great latitude is allowed in reception of circumstantial evidentiary facts, and everything that tends to connect the supposed evidentiary fact with the *factum probandum* is admissible to prove that fact.

66. In action against husband's parents for alienation of his affections, where there was evidence that plaintiff's husband knew in general way of his father's wealth, and there was also evidence that husband had been disinherited because of his marriage, and that financial pressure had been brought to bear

upon him to accomplish alienation, evidence of father's wealth was admissible on question of alienation.

67. While parents have right to disinherit son because displeased with his marriage, they have no right to use threat of disinheritance as a club to accomplish a wrongful purpose.

68. In action against husband's parents for alienation of his affections, evidence of wealth of husband's father, although greater than that of husband's mother, offered as bearing upon question of exemplary damages, *held* properly received when its application was limited to a possible verdict against husband's father alone.

69. Only damages for which they are jointly liable can be recovered from joint tort-feasors by a joint verdict.

70. In action against joint tort-feasors, in which exemplary damages are sought, where one of defendants is innocent of offense for which such damages are punishment, plaintiff is not concluded by having brought suit against all, but may discontinue against innocent defendant during trial and proceed against defendants who on evidence are liable for punitive damages.

71. Liability of husband and wife as joint tort-feasors is unaffected by marital relation.

72. When action is against several defendants, financial condition of one cannot be used as basis for determining amount of exemplary damages against any other, unless that one is least wealthy of all, but evidence of financial condition of individual defendants may be admitted to be used only against particular defendant in case verdict is against him alone.

73. In actions against joint tort-feasors there may be recovery against any or either of defendants proved to be guilty.

74. In action against joint tort-feasors, the issues on trial including separate liability of defendants, evidence directed to establishing such liability is not irrelevant.

75. On question of exemplary damages, it is incumbent upon plaintiff to show actual means of defendants.

76. Questions on cross-examination, so framed that affirmative answers would adduce evidence that would be clearly relevant, are not rendered improper because prompted by something that witness had written, where questions do not call for contents of writing.

77. Question covering material matter, asked plaintiff on redirect examination, and objected to as not growing out of cross-

examination, *held* admissible in discretion of court, even if not strictly redirect examination.

78. In action against husband's parents for alienation of his affections, hypothetical question asked doctor respecting his opinion as to cause of plaintiff's condition in view of his examination and facts stated, *held* properly permitted against objection that certain of such facts were not connected up with the defendants, no claim being made that facts enumerated did not appear in evidence, and there being evidence making liability of defendants question of fact for jury.

79. In such action, argument of plaintiff's counsel *held* not objectionable as relating to claim abandoned early in case, neither plaintiff's testimony nor statements of her counsel justifying claim that plaintiff was estopped to make argument excepted to.

80. In such action, argument of plaintiff's counsel, that defendants had introduced into case evidence relating to an abortion performed on plaintiff, objection to which was sustained and jury instructed not to consider argument, *held* not to show reversible error.

81. Exception to the failure of the court to charge according to certain specified numbered requests, and to the charge as given thereon, *by reference to number of each request only,* *held* too general to require attention, it being necessary to point out matters relied upon in requests, and to indicate wherein charge as given was claimed to be erroneous.

82. Exception to charge, reciting substance of language claimed to have been used by court, *held* unavailing, where court did not use such language, either in fact or effect.

83. In action against husband's parents for alienation of his affections, exception to part of charge which stated that plaintiff "may now recover once for all and for all damages," on ground that it overlooked "the fact that she [plaintiff] was then and is now drawing alimony from her husband," *held* not sufficiently specific to apprise court of claim that receipt of alimony should be considered in reduction of damages.

84. In such action, acts of husband's parents maliciously intended to alienate their son's affections from plaintiff were not lawful acts such as did not constitute breach of duty toward plaintiff, hence principle that motive actuating one who exercises a legal right is immaterial has no application.

85. In such action, instruction that "the actual presence of defendants, or either of them, during process of the alienation is not necessary to be shown. It is enough * * * that they or either of them had a controlling cause in producing it and such influence may have been exerted without their presence," *held* correct statement of law, not objectionable as inapplicable to evidence in case.

86. Where questions arise on exceptions to findings and rulings of court below, scope of inquiry is limited to review of claimed legal errors, and Supreme Court is bound to indulge every reasonable presumption in support of action of trial court.

87. Rule that absence of exception to prejudicial argument prevents raising of issue of its impropriety as matter of law does not deprive such argument of evidentiary value upon the issues raised by motion to set verdict aside.

88. Motion to set verdict aside is addressed to legal discretion of trial court, whose action is only reviewable for failure to exercise such discretion, or for what amounts in law to abuse of discretion.

89. To justify Supreme Court in setting aside finding of trial court that verdict was not result of bias, passion, or prejudice, it must appear, from record, that there is no reasonable basis therein for finding.

90. In alienation suit, size of verdict alone *held* not to show that it was result of bias, passion, or prejudice.

91. In alienation suit, record *held* to afford reasonable basis for finding of trial court that verdict was not result of bias, passion, or prejudice.

92. In a case admitting of exemplary damages, amount of such allowance is largely discretionary with jury, in determining which they should take into account character and standing of defendants, malice or wantonness of act for which they are found guilty, and financial standing of least wealthy defendant.

93. In action against husband's parents for alienation of his affections, fact that exemplary damages were allowed in excess of the individual wealth of husband's mother, the least wealthy of defendants, is not controlling on question of whether verdict was result of bias, passion, or prejudice.

94. Trial court, in disposing of motion to set verdict aside on ground of bias, passion, or prejudice, should consider evidence most favorably to plaintiff.

95. Demonstration of spectators in a court room is not sufficient reason for granting new trial, unless it appears that rights of parties were prejudiced thereby.

96. Where trial court grants a *remittitur*, it should, in order to avoid danger of injustice to defendant by forcing upon him an excessive judgment, fix the amount on acceptance of which by plaintiff new trial would be denied, at minimum sum which jury could reasonably be expected to allow, and which court could clearly see was not excessive.

97. Power to grant a *remittitur* is not confined to cases where it is possible to determine what verdict should have been with certainty, as by computation.

98. In cases where there is no legal measure of damages, and they are unliquidated so that amount thereof rests in judgment and discretion of jury, although verdict may be considerably more or less than in judgment of court it ought to have been, verdict will not be disturbed, unless it is so great or small as to indicate that it is result of perverted judgment, accident, or gross mistake.

99. Where trial court finds verdict so excessive as to require its interference, and that it was not result of passion or prejudice, it is proper case for correction of verdict by *remittitur*.

100. In proper case for *remittitur*, trial court should fix as damages the minimum sum which jury could reasonably be expected to allow, and which court can clearly see is not excessive.

101. Whether trial court has abused its discretion in disposing of motion to set verdict aside is determined by whether discretion of court has been exercised on grounds or for reasons clearly tenable, or to an extent clearly unreasonable.

102. Where trial court on motion to set verdict aside has ordered a. *remittitur*, Supreme Court will interfere only when award of lower court is manifestly and grossly excessive.

103. Exemplary damages in a civil action, while not a bar to criminal proceeding for same act, are allowed in part in nature of punishment.

104. In action against husband's parents for alienation of his affections, refusal of trial court to set verdict aside as excessive, misconceived in law, not based on evidence, and as based upon and influenced by bias, passion, and prejudice, and in directing *remittitur* reducing damages to specific sum, *held* proper exercise of its discretion.

105. Notwithstanding petition for new trial is addressed to discretion of court, admission and rejection of evidence upon such petition is governed by ordinary legal rules.

106. Use of affidavit made in support of motion for new trial, to refresh memory of deponent, who, although testifying as witness for petitioners before commissioner appointed by court to take testimony, was adverse, *held* proper.

107. Applications for new trial on ground of misconduct of jurors are addressed to sound discretion of court, whether applications should be granted being determined in each case upon particular facts therein.

108. Petition for new trial involves not only determination of disputed facts, but presence or absence of probable injury to defeated party through misconduct complained of, whether either parties, their attorneys, or friends were implicated in such misconduct, and underlying question of public policy.

109. Petitioner for new trial on ground of alleged misconduct of jurymen has burden of establishing claimed misconduct.

110. Claimed misconduct of jurymen in expressing opinion about facts in case and its outcome, *held* not established by the satisfactory proof required by law.

ACTION OF TORT. Plea, general issue. Trial by jury at the September Term, 1922, Chittenden County, *Moulton*, J., presiding. Verdict and judgment for plaintiff. The defendants excepted. The opinion states the case. *Affirmed.*

*J. J. Enright, V. A. Bullard, C. H. Darling, Guy M. Paige* for the defendants.

*Warren R. Austin* for the plaintiff.

TAYLOR, J. The defendants are the parents and the plaintiff the wife of Charles Douglas Woodhouse, generally called Douglas Woodhouse. The marriage of plaintiff and her husband occurred in September, 1918, following an acquaintance and courtship extending over several years. Their marriage engagement was made in February, 1918, but was not announced to the defendants until a short time before the wedding. Douglas was then about 30 years old and the plaintiff five years younger. The relations of Douglas and the plaintiff became estranged in

1919, and they ceased to live together as husband and wife early in 1920. In the fall of 1920 Douglas went to Reno, Nevada, where he instituted divorce proceedings which were pending when this case was tried in the county court.

The action is tort for the alienation of the affections of plaintiff's husband. The defendants' answer is a general denial. There was a trial by jury at the September Term, 1922, resulting in a verdict and judgment for the plaintiff. The case was argued in this Court at the May Term, 1924, on defendants' exceptions and on a petition for a new trial on the ground of misconduct of jurors. The questions first briefed relate to the sufficiency of the evidence, raised by a motion for a directed verdict. Some of the points covered by the motion were also presented by requests to charge. As the exceptions saved to the overruling of the motion for a directed verdict and to the refusal of many of the requests to charge raise the same questions they do not require separate treatment.

The grounds of the motion for a directed verdict are numerous and involved. It would prolong this opinion unnecessarily to discuss the grounds *seriatim.* It will be more profitable to examine the whole evidence in the light of the principles underlying the plaintiff's right of recovery, supplementing such general discussion by the consideration of particular points that are not thus adequately covered.

Defendants' counsel give prominence in their brief to what they refer to as "the angle of departure." Speaking of the relations of parents to a daughter-in-law they assert without qualification that parents owe the daughter-in-law no legal duty. Manifestly this is not an accurate statement, speaking gener-. ally. A proper understanding of the rights and duties of parents respecting the marital relations of their children is of vital importance to a correct determination of the questions presented for review. It may be admitted that the marriage of the child· imposes no obligation upon the parent to receive the child's spouse within the bosom of his own family. It has been said that the parents may hold aloof, decline to recognize the wife, show no interest in her or her children and even disinherit their son for marrying without their approval; in short, that the law requires only that they do not meddle unjustifiably with the domestic felicity and affections of their son and his wife. *Cooper* v. *Cooper,* 102 Kan. 376, 171 Pac. 5.

[1, 2]   It is uniformly held that parental interest in their children is not interrupted by their marriage, and that parents have a right to continue their solicitude and parental care and to be protected in the continuance of such interest.   The law recognizes the natural solicitude of the normal parent for the welfare of his child, and accordingly indulges the presumption that in his influence, association, and conduct with the child he is acting within his rights.   No inference of malice will flow from the mere fact of parental interference in the marital relations of a child.   In such cases the proof must go further and show that such interference was without just cause or excuse—in other words, was malicious.   *Fronk* v. *Fronk,* 159 Mo. App. 543, 141 S. W. 692.

[3]   The authorities are agreed upon the proposition that a parent will not be liable to the spouse of his child for causing their separation, if the counsel given and persuasion used by him are such as he fairly and honestly considers to be called for by the best interests of the child; that is, if his acts are done in good faith and without malice.   The law of the subject is well stated in *Multer* v. *Knibbs,* 193 Mass. 556, 79 N. E. 762, 9 L. R. A. (N. S.) 322, 9 Ann. Cas. 958, where the prior decisions are collected   For additional cases see *Roe* v. *Roe,* 315 Ill. 120, 145 N. E. 804; 13 R. C. L. 1471, § 522; notes 9 L. R. A. (N. S.) 322; 46 L. R. A. (N. S.) 465; Ann. Cas. 1917E, 1017.

[4-6]   While the law recognizes a superior right of interference on the part of parents, and will justify such interference for causes which would be no justification in favor of strangers, it is not to be understood that parents may influence their child to separate from a spouse with impunity.   The relation of parent and child does not justify a deliberate attempt without cause to bring about such a separation.   To do so without justifiable cause is a tort for which the parent like any other person is liable. This is the doctrine of practically all the cases, including many cited by the defendants.   See note 9 L. R. A. (N. S.) 322, 324. It is sometimes said that in such an action the parent is liable only when he acts maliciously in bringing about the separation; and, again, that stronger evidence is required to maintain the action against parents than against strangers.   But the distinction found in the cases is merely a matter of terminology.   In principle they are in entire accord.   The distinction between the liability of parents and that of strangers is only in what will

justify their interference.  Malice is generally, if not always, deemed an essential element of actions for alienation.  This is so held where seduction or adultery is not involved.  13 R. C. L. 1466, § 515; *Geromini* v. *Brunelle,* 214 Mass. 492, 102 N. E. 67, 46 L. R. A. (N. S.) 465; 30 C. J. 1122, § 974.  And, where alienation is by means of adultery, it seems that malice in law is presumed from the wrongful act.  See *Miller* v. *Pierce,* 86 Vt. 322, 85 Atl. 620, 43 L. R. A. (N. S.) 332.  However, there is this difference in the two classes of cases, which is evidential merely: In case of a stranger, malice may be inferred from the fact of alienation, while in case of a parent, good faith will be presumed in the absence of circumstances indicating malice.  So it is that in actions against parents of a spouse the plaintiff has the burden of showing that the conduct complained of was actuated by malicious motives.  *Hodgkinson* v. *Hodgkinson,* 43 Neb. 269, 61 N. W. 577, 27 L. R. A. 120, 47 A. S. R. 759; *Love* v. *Love,* 98 Mo. App. 562, 73 S. W. 255; *Lannigan* v. *Lannigan,* 222 Mass. 198, 110 N. E. 285; *McLery* v. *McLery,* 186 Wis. 137, 202 N. W. 156; *Crowell* v. *Jeffries,* 79 Ind. App. 513, 134 N. E. 908, 137 N. E. 556; note 46 L. R. A. (N. S.) 465.

[7]  It follows that the *quo animo* is the important consideration where parents are charged with alienating the affections of a child.  Was it malicious or was it inspired by a proper solicitude for the welfare and happiness of the child?  In reviewing the evidence, we are to assume that the motives of the defendants in what they did were good unless there was evidence fairly tending to show the contrary.  But the claim of the defendants that the presumption indulged in their favor should be weighed as evidence on the authority of the Cowdry Will Case (77 Vt. 359, 60 Atl. 141) must be rejected as unsound.  The function of this presumption is locative and not probative, as to which see *Sheldon* v. *Wright,* 80 Vt. 298, 320, 67 Atl. 807; *Rutland Ry. Lt. & Pr. Co.* v. *Williams,* 90 Vt. 276, 281, 98 Atl. 85; *Zabarsky* v. *Employers' Ins. Co.,* 97 Vt. 377, 123 Atl. 520.

[8]  Express malice need not be proved.  Malice in the sense used in actions of this kind implies no more than the intentional doing of a wrongful act without just cause or excuse.  Direct evidence of the parents' wrongful motives is not required, but malice may be inferred from conduct, as in other cases where it is in issue.  *Cornelius* v. *Cornelius,* 233 Mo. 1, 135 S. W. 65;

13 R. C. L. 1474; note Ann. Cas. 1912C, 1180; note Ann. Cas. 1917E, 1017. It may be inferred from wrongful and unjustifiable conduct which causes alienation. *Clark* v. *Clark*, 187 Ind. 25, 118 N. E. 123; *Westlake* v. *Westlake*, 34 Ohio St. 621, 32 A. S. R. 397; 30 C. J. 1122, 1136.

[9, 10] Defendants' counsel have reviewed the evidence in detail, but they treat it piecemeal, asserting the insufficiency of this circumstance or that circumstance to support the verdict. This is not the real test of its sufficiency. Separate acts or separate lines of conduct may not show malice, for instance, while a number of acts considered together may disclose a purpose which would not appear from those acts considered separately. It is a familiar saying that "many littles make a mickle." To characterize the defendants' conduct properly, it is necessary to consider their actions in the light of all the circumstances taken together. What, standing alone, might be regarded as an insignificant act, may take on an entirely different hue when viewed in the light of other circumstances. Besides, regard must be had for the cumulative effect of the whole evidence instead of the weight of each piece of evidence standing alone. Moreover, the fair inferences from the evidence based upon the natural course of events and of human experience are as much evidence as the principal facts from which the deductions flow. *State* v. *Kamuda*, 98 Vt. 466, 129 Atl. 306; *Austin* v. *Bingham*, 31 Vt. 577. If it were conceded that no one of the individual acts of the defendants shown in evidence necessarily disclosed impropriety of conduct, still it would not follow that the evidence as a whole did not support the verdict.

The following are some of the recent cases where the doctrine respecting the use of circumstantial evidence to establish alienation of affections has been discussed: *Mussellem* v. *Freun*, 101 Okla. 45, 225 Pac. 370; *Hope* v. *Twarling*, 111 Neb. 793, 198 N. W. 161; *McGuffie* v. *Hooper*, 122 Me. 118, 119 Atl. 111; *Leavell* v. *Leavell*, 122 Mo. App. 654, 99 S. W. 460; *Briles* v. *Briles*, 66 Ind. App. 444, 112 N. E. 449; *Jones* v. *Jones*, 96 Wash. 172, 164 Pac. 757; *Cornelius* v. *Cornelius*, 233 Mo. 1, 135 S. W. 65; *Nelson* v. *Nelson* (C. C. A.) 296 Fed. 369. In *Cornelius* v. *Cornelius* it was argued as here that there was no proof of wrongful motive in what the defendant said or did; and none that what he said or did caused the separation. The Court had this to say: "But learned counsel inadvertently argue unsoundly

in that behalf; this, because the record abounds with signs of the defendant's antipathy for his son's wife. Wrongful motives like good ones are impalpable—a condition of the mind. They are not to be seen by the eye of the body, but by the mind's eye. * * * They may be proved only by those visible acts or words shadowing forth their existence in the mind—words and acts standing as outward manifestations of inward feelings." The comments of Manton, J., in *Nelson* v. *Nelson* are pertinent: "We must not be unmindful of the facts that human experience of this kind, resulting in a broken home, results from the accumulation of efforts, stealthily carried on. This disintegrating work may be resorted to with many subterfuges. A plaintiff may not produce the strongest kind of evidence to make out a case. * * * The fact that evidence is circumstantial does not impare its usefulness nor deprive it of potency."

[11]    Counsel quote extensively from the defendants' evidence and devote considerable space in their brief to a discussion of what it tends to show. It is hardly necessary to say that the function of this Court on review of the motion is confined to determining whether there is evidence tending to support the material allegations of the complaint. We cannot weigh the evidence, and, so far as it is conflicting, we can consider only such as supports the verdict. Where different inferences may reasonably be drawn from the evidence we are bound to accept the inference most favorable to the plaintiff.

[12]    Defendants' counsel take up the complaint paragraph by paragraph and undertake to show that the evidence does not sustain the action on that particular branch of the case. Thus, they challenge the evidence bearing on the various allegations of the means by which it is claimed the alienation of their son's affections was accomplished, and assert either the want or the insufficiency of evidence to support the particular allegation. But it is not profitable to review the evidence in this manner. The test is whether the evidence supports the ultimate facts alleged in the complaint. It is not essential to a recovery that the evidence should support all of the allegations of means employed to accomplish the alienation. 13 R. C. L. 1463, 1464. In other words, the plaintiff need not prove more than is necessary to a recovery though more is alleged. *Snyder* v. *Parmalee,* 80 Vt. 496, 68 Atl. 649; *Bosworth* v. *Bancroft,* 74 Vt. 451, 453, 52 Atl. 1050. Respecting the means employed by the defend-

ants to accomplish the alienation, the case went to the jury on the claims that it was brought about by the influence and use of their wealth and by encouraging plaintiff's husband to pay his attentions to one Mrs. MacClelland. It is unimportant, then, whether the other means alleged were proved as laid or not.

[13]  It would not be profitable to undertake any extended review of the evidence. It covers more than 1,500 pages besides a large number of written exhibits. We have examined the evidence and the extended comments of counsel in respect thereto with the care commensurate with the importance of the case, and are convinced that the motion for a directed verdict was properly overruled. It is not, nor can be, questioned that the affections of plaintiff's husband in some way became alienated from her, resulting in the loss of his consortium. We are satisfied there was evidence, if believed, from which the jury would have a right to find that this came about through the active interference of the defendants prompted by malice toward the plaintiff.

This marriage was in no sense a misalliance. The plaintiff was a talented woman of good character and social standing. Douglas had been acquainted with her for several years, and for at least three years before the marriage had been a constant visitor at her home, much of this time an ardent suitor. It was a union formed upon mature deliberation. There was no evidence of misconduct or unworthiness on the part of the plaintiff. On the contrary, both defendants testified that they at no time had any cause for criticizing her. Both testified that they did not regard her as beneath their son, and throughout the trial they professed to have had no objection to the marriage. It follows that there is a total absence of any excuse for parental interference by advice or otherwise such as parents might give without malice. Besides, the defendants do not claim, but rather deny, that they even advised a separation; so the principle on which much of the defendants' argument is based has no application. See *Lockwood* v. *Lockwood*, 67 Minn. 476, 70 N. W. 784. Defendants' actions ever after they learned of Douglas' engagement to the plaintiff were so wholly inconsistent with their professions of regard at the trial that the jury would be justified in discrediting their testimony. They advance no reason for the separation except Douglas' infatuation for Mrs. MacClelland; but the evidence shows that the alienation of his affec-

tions for the plaintiff had substantially been accomplished before he became acquainted with the MacClelland woman. Considering that the evidence showed the plaintiff and her husband were happy in each other's company when left to themselves, even to a time near their separation, it is a potent circumstance that no other probable cause than the influence of the defendants is disclosed for Douglas' progressive change of attitude toward the plaintiff ever after they learned of his proposed marriage. Their conduct thereafter toward the plaintiff was most unnatural on any theory advanced in defense, but on the contrary was consistent with their expressions of dislike for her shown by the evidence. The circumstances would justify an inference of malice and a deliberate plan to bring about the result finally accomplished. These facts, if found to exist, would so characterize the other evidence as to clearly make the question of liability one of fact for the jury.

The defendants discuss at some length the rule respecting inferences that may be drawn from circumstantial evidence, citing with other cases *Wellman, Admr.* v. *Wales,* 97 Vt. 245, 253, 122 Atl. 659, 662. That the rule invoked applies only when the liability rests entirely upon circumstantial evidence is sufficiently indicated in the Wales case. It is there said that in such cases the circumstances taken together must reasonably tend to support the inference; that the conclusion from the facts offered must be at least the more probably hypothesis with reference to the possibility of other hypotheses. In the case at bar the evidence was not wholly circumstantial; but, had it been, we take the view that it answered the requirements of the rule stated above.

[14-16] It is urged that plaintiff failed to establish the actionable consequences of the conduct complained of, in that the case does not show that the loss of consortium was due to the defendants' acts, but does show that it was due to her own acts induced by Douglas' conduct with Mrs. MacClelland. There can be no question that loss of consortium was fully established. The real question then relates to causal connection. It is argued that the loss of consortium arose from plaintiff's choice; that she could not by her conduct in refusing to continue the marital relations supply the otherwise missing element. The argument on this ground of the motion loses sight of the basis of plaintiff's right of recovery, as well as the evidence that connects the de-

fendants therewith. The gist of the action is the loss of consortium of the husband. *Jenness* v. *Simpson,* 84 Vt. 127, 78 Atl. 886. This includes his affection, his conjugal society, his aid and cooperation in every conjugal relation. It is not essential to the maintenance of the action that there should be any loss of service or any pecuniary loss whatever. Nor is the actionable character of the injury dependent upon separation or the physical absence of the husband. The wrong could be inflicted though the plaintiff was living with her husband at the time. *Lavigne* v. *Lavigne,* 80 N. H. 559, 119 Atl. 869; *Foot* v. *Card,* 58 Conn. 1, 18 Atl. 1027, 6 L. R. A. 829, 18 A. S. R. 258; *Adams* v. *Main,* 3 Ind. App. 232, 29 N. E. 792, 50 A. S. R. 266; *Parker* v. *Newman,* 200 Ala. 103, 75 So. 479; *Rott* v *Goehring,* 33 N. D. 413, 157 N. W. 294, L. R. A. 1916E, 1086, Ann. Cas. 1918A, 643; *Rinehart* v. *Bliss,* 82 Mo. 534, 52 A. R. 385; *Betser* v. *Betser,* 87 Ill. App. 399; note Ann. Cas. 1918A, 647.

It was held in *Beach* v. *Brown,* 20 Wash. 266, 55 Pac. 46, 43 L. R. A. 114, 72 A. S. R. 98, that procuring a divorce from her husband would not prevent the wife from maintaining an action against a third person for prior alienation of his affections.

[17] It is not necessary to confer a right of action for alienation of affections that the defendants' conduct be the sole cause of the alienation or separation. It is sufficient if it is the controlling cause. *Baird* v. *Carle,* 157 Wis. 565, 147 N. W. 834; *Hughes* v. *Holman,* 110 Ore. 415, 223 Pac. 730, 31 A. L. R. 1108; *Rush* v. *Buckles,* 93 W. Va. 493, 117 S. E. 130; *McLery* v. *McLery,* 186 Wis. 137, 202 N. W. 156.

When all the evidence upon the cause of the separation is considered it is clear that it made a jury question whether the defendants were answerable for the loss of consortium. The following facts are relied upon in support of the claim that the plaintiff voluntarily separated herself from Douglas, and that the loss of consortium arose from her own choice. The plaintiff had discovered Douglas in Washington with Mrs. MacClelland. He represented to her that the woman was his cousin. Relying on his representation, and at his request, she returned with him to Burlington where they lived together for a few days at the home of her parents. It was there arranged that the plaintiff should go to Texas for her health. Douglas provided funds for the trip and accompanied her as far as New York. He promptly
8

returned to Washington and continued his flirtation with Mrs. MacClelland. ' In May, 1920, the plaintiff learned 'what was going on and wrote Douglas for an explanation. He went to Texas to see her. She did not see him alone, and he was there only a short time. As agreed at their conference he went to Burlington and she followed a few days later. Subsequently during that summer the plaintiff made efforts to get Douglas to return to her, but was unsuccessful. They did not live together as husband and wife after the plaintiff learned the truth about Douglas' relations with Mrs. MacClelland. Plaintiff testified in cross-examination that it was true she refused to receive Douglas and refused to live with him because of the escapade with the MacClelland woman. The defendants seem to regard this answer as conclusive of the whole matter. They argue that Douglas went to Texas with the evident purpose of continuing marital relations; that if the plaintiff had not refused to continue such relations there would have been no loss of consortium; and that by necessary inference the plaintiff was refusing to live with her husband because of his relations with Mrs. MacClelland, and so the loss of consortium was due to her voluntary act and not to any act of the defendants.

[18, 19]    The whole evidence lacks the conclusive effect claimed for it. It fairly tended to show that the loss of consortium had occurred as early as November, 1919, which was before Douglas went to Washington. Before any of the events relied upon by the defendants to defeat recovery the alienation of Douglas' affections had become an accomplished fact, to the extent that he was engaged to marry the MacClelland woman. There was evidence that his subsequent manifestations of interest in or care for the plaintiff were mere subterfuge. When discovered in company with Mrs. MacClelland, he disarmed the plaintiff's suspicions by falsehood. His motive in returning with plaintiff to Burlington followed by arrangements for her to go to Texas, ostensibly for her health, is disclosed by the fact that during his brief stay with the plaintiff he was consulting an attorney with reference to divorce proceedings which were later instituted. Clearly there was evidence from which the jury could find that the acts and conduct of the defendants were the controlling cause of plaintiff's loss of consortium. The fact that there was conflicting evidence, or evidence that other causes may have contributed to this result, made it still a jury ques-

tion. That there may be such a thing as liability for partial alienation of the husband's affections was decided in *Fratini* v. *Caslini*, 66 Vt. 273, 29 Atl. 252, 44 A. S. R. 843.

### EXCEPTIONS TO EVIDENCE

[20, 21]  The plaintiff took the testimony of Douglas Woodhouse by way of deposition. When the deposition was offered in evidence, the defendants objected to certain portions of it. The first group of exceptions briefed relate to claimed errors in admitting certain parts of the deposition when portions of the context had been excluded, the claim being that the striking out of a part made a material change in the meaning of the part remaining. The record does not support the claim with reference to any of these items. The defendants did not attend Douglas' wedding. Whether he had notified them of the date of his marriage was in issue. He had testified that he had not wired the family. He was then shown a letter and asked if an indicated part of it refreshed his recollection as to whether he had done so or not. The question was objected to for an immaterial reason, and the witness answered: "It says so there. I must have wired them." The objection in the court below that the answer brought in the contents of the letter was sustained by striking out the reference thereto, and the rest of the answer was allowed to stand. The part excluded did not materially affect the relevant part of the answer. Our practice permits the exclusion of part of the answer, provided the meaning of the part left is not changed. It should be noticed, in connection with questions relating to Douglas' testimony, that the trial court found he was an adverse witness within the meaning of the statute.

[22]  Douglas had testified in the deposition that sometime in 1919 he had told the plaintiff, in substance, that his parents had threatened to disinherit him. He was then asked if it was a fact and answered that it was not. Then followed the question, "Were you lying to her?" to which he replied, "I was." The testimony leading up to the quoted question and answer was excluded on defendants' objection, but they insisted that the single question and answer should stand. The court correctly ruled that it was so related to the part objected to by the defendants that it should not be received standing alone.

Clearly the question was directed to the preceding answer. Without the context, the question and answer would have a perverted meaning, and its admission would have violated the very rule the defendants are contending for.

[23-24] Respecting assigned error 21, it is enough to say that the question argued was not raised by objection in the court below. Assigned errors 25 and 26 arose in this way: Douglas was being examined with reference to the matters that had occasioned disagreements between him and his wife and "the Florida trip," "the conduct of the defendants at the hospital," "the closed door of their house, speaking psychologically," "their absence from the wedding," and "their so-called indifference" had been specially referred to in that connection. He had testified that the interpretation of those acts had not been the occasion of their disagreement. Then followed a cross-examination for the evident purpose of showing the contrary, which was excluded on defendants' objection (except a single question and answer of no importance here). The last question excluded again enumerated the acts to which the inquiries were directed. The succeeding questions admitted against objection referred to "those topics, those facts." It was urged as a ground of objection that the result of striking out the previous question and answer gave the admitted evidence "a false reference." But the contrary fairly appears from the whole record.

[25] The following consecutive questions and answers were contained in the deposition:

1. "Q. At that time were you resentful of the meddling of your parents?

A. Never.

2. Q. Did you resent the attitude your parents had taken toward your marriage?

A. I thought it was unjust.

3. Q. Did you try in some manner to express your resentment to them?

A. I called their attention to the injustice of it."

On defendants' objection the answer to the second question was excluded. Thereupon, the third question and answer were objected to on the ground that, as the record stood, there was no indication that he had resentment, and that the answer was not responsive. The admission of this question and answer is assigned error 56. The claim now advanced that the reference

was altered so that the witness was made to say that he called the attention of his parents to the injustice of their "meddling" referred to in the first question was not made below. But that objection aside, the second question was left in the record which, with the fact that the answer to the first question was an emphatic denial, makes it clear that the reference was unchanged.

[26]   Under assigned error 22 the defendants challenge the admissibility of the following question and answer in Douglas' deposition on the ground that it was immaterial: "Q. Now she interpreted your parents' attitude to her and to you with reference to money matters as hostility, didn't she? A. As I recollect she interpreted all their attitudes as hostile." The record shows that the exception taken was to the overruling of defendants' motion to strike out the answer as not responsive. The answer was responsive to, but broader than, the question. This was not pointed out as the ground of objection with sufficient definiteness to make it available on review. Besides, the question of materiality was not raised below, and so cannot be relied upon here. See *Hurlburt* v. *Hurlburt's Estate,* 63 Vt. 667, 670, 22 Atl. 850; *Walsh* v. *Pierce,* 12 Vt. 130.

[27]   Assigned error 74 relates to a question and answer in the deposition of Dr. Slocum, the physician who attended Douglas when he was sick in a hospital with typhoid fever, introduced in evidence by the plaintiff. The witness testified that he saw Douglas' father at the hospital in the room occupied by Douglas and the plaintiff; that the father did not recognize the plaintiff; that afterwards the father said to the witness, "I suppose you think it strange the way I treat Mrs. Woodhouse, but I do not recognize her as a member of the family." Then followed the testimony to which this exception relates: "Q. He did in that conversation make a comparison of her to his son? A. He told me that as far as his son was concerned he could have everything. * * * As far as his son was concerned no expense was to be spared, *but as far as his wife was concerned he did not recognize her as a member of the family."* The italicized part of the answer was objected to as "an interjection and not proper." It is now claimed that the matter objected to was immaterial and not responsive. We spend no time with the merits of the question argued, for if error should be found it would be harmless, the witness having already testified to the same thing without objection.

[28, 29]   Assigned errors 93 and 94 relate to numerous rulings during the examination of witness Hill, by which it is claimed the witness and the defendants were unduly prejudiced. The question presented by these exceptions is whether the court erred in requiring the witness to give the direct answer, "yes or no" to certain questions and in striking out answers which the court regarded as evasive. The order or manner of conducting the examination of witnesses is so far a matter of discretion with the trial court that it will be reviewed only for abuse of discretion. *Hopkinson's Admr.* v. *Steel,* 12 Vt. 582, 584. It requires no extended reading of the record to discover that the witness was adverse, as the court reluctantly found, and that he repeatedly offended by evading a direct answer and injecting matter not called for by the question. The witness had the undoubted right to explain or qualify his answers. Opportunity to do this was not denied, but on the contrary was fully exercised. If, as claimed, his effectiveness as a witness for the defendants was impaired by this incident, it was neither the fault of the court nor of the plaintiff.

[30]   Witness Hill had testified that some time in June or July, 1919, he caused the garage to be locked in which was kept a car that the plaintiff had been driving to prevent her having access to it. By whose direction this was done was in dispute. The witness testified that it was by Douglas' direction, while the plaintiff claimed that it was by the direction of defendant L. E. Woodhouse. Witness was asked if he did not tell Douglas a day or two after that his orders came from headquarters and that his father had told him to lock up the car, which he denied. For the purpose of impeachment the following question and answer in Douglas' deposition was offered in evidence: "Q. And did Mr. Hill tell you that his orders came from headquarters? A. I believe he did." The admission of this testimony against the objection that the word "headquarters" did not refer to defendant L. E. Woodhouse, and that it had no tendency to impeach the witness, is assigned as error. The impeaching quality of the statement was not the real point of the objection. The evidence fairly tended to show that the reference was to the defendant L. E. Woodhouse. If so intended, which was a question for the jury, the statement that his orders came from headquarters would tend to contradict the witness. It is not essential, as claimed by the defendants,

that the two statements be "coextensive." It is enough that they are inconsistent. 2 Wigmore on Ev. § 1040. Plainly the "orders" referred to were instructions to lock up the car, for that was the subject-matter of the conversation. So understood, the two statements were in effect inconsistent.

[31, 32]   One of the important issues of fact arising in the introduction of evidence was whether witness Hill was acting in certain things done by him as agent, or under the direction, of the defendants or either of them.   Considerable of his examination was directed to this issue, and was permitted to be conducted as in cross-examination, since he was found to be an adverse witness.   Plaintiff claimed and was endeavoring to show that although the witness denied the agency, yet his acts proved the contrary.   Besides, she was undertaking to show the witness' bias in favor of the defendants which was a relevant issue.   Numerous exceptions relied upon relate to one or both of these lines of inquiry.   Assigned errors 88, 89, and 92 are of this character.   It is enough to say that none of these exceptions show reversible error.   If some of the circumstances inquired about are somewhat remote, the question is not reviewable because it was a matter of discretion, abuse of which is not undertaken to be shown.   Respecting proof of agency, direct evidence is not indispensable—indeed frequently is not available—but agency may be shown by the acts of the parties.   *Walsh* v. *Pierce*, 12 Vt. 130, 138.   Circumstances such as the relation of the parties to each other and their conduct with reference to the subject-matter under investigation may be relied on.   It has been held that, notwithstanding the alleged principal and agent are the only witnesses called and both deny the existence of the relation, still the finding of the agency may be justified upon consideration of the whole evidence and the fair and reasonable inferences that may be drawn therefrom.   21 R. C. L. 820. Apart from its bearing on the issues, the evidence challenged by these exceptions was too colorless to be harmful.

[33, 34]   Assigned errors 96, 97, and 98 are briefed in a separate group and grow out of the testimony of Hill, to the effect that he had at times aided Douglas to deceive his wife as to his whereabouts.   The first exception related to an answer which was substantially the same as an answer already given without objection.   This exception, then, would not in any event present reversible error.   *Herrick* v. *Town of Holland*, 83 Vt.

502, 512, 77 Atl. 6. The second exception presents a similar question. Only the remaining assignment of error is for consideration. Hill was being inquired of concerning the method by which bills of certain merchants in Burlington contracted by the plaintiff on Douglas' credit were transmitted to Douglas who was then at Reno. Plaintiff was claiming that the circuitous route by which mail was forwarded to Douglas and his answers returned, in which the defendants participated, bore upon the issues in the case respecting liability. Hill was asked if throughout September and October, 1920, he was not receiving at the Merchants National Bank, where he was employed, bills against Douglas from merchants of the city. Against objection that it was immaterial, witness answered, "I saw bills go through the bank." The materiality of the answer becomes apparent when the theory on which it was admitted is considered, *viz.:* That the defendants participated in sending these bills to Douglas by a circuitous route for the purposes of concealing Douglas' whereabouts from the plaintiff, which would tend to characterize their acts relied upon to establish liability. In any event, the answer was rendered entirely harmless by what followed, wherein the witness testified substantially to the same thing and more without objection.

[35]    Defendants brief a group of exceptions under the caption, "Evidence received against the defendants involving acts for which they were not legally responsible." The basis of these claimed errors is that the evidence does not connect the defendants with the acts in question. Assigned error 35 raises the question whether the court erred in admitting the following question and answer in Douglas' deposition: "Q. On your trip to the Adirondacks wasn't your wife in tears most of the way? A. I remember she cried a little after we got there, but I don't remember she was tearful while we were going there." It was not a valid objection that there was nothing to connect the defendants with the "crying fit." The attendant circumstances were sufficient to make it a jury question whether her grief was due to the alienation of her husband's affections. If so found, it would be material on the question of damages. The fact the evidence did not disclose that the immediate cause of her grief was something that the defendants then said or did is not controlling. As we have seen, there was evidence connecting the

defendants with the alienation, and so making them liable for the results thereof, including the plaintiff's mental suffering.

[36]     Assigned errors 99, 100, and 101 are of a similar nature. These exceptions were taken during the introduction of Hill's testimony respecting the method employed to transmit bills against Douglas to him at Reno referred to above. The particular point relied upon is that the plaintiff failed to make the promised connection. Defendants assert the want of such evidence without more which does not answer the requirement that the burden of showing error is upon the excepting party. But the plaintiff has pointed out evidence, which, with the inference to be drawn therefrom, supplies the connection.

[37]     It was in evidence that in June before her marriage the plaintiff became pregnant by Douglas. She was permitted to testify, against the objection that what she did had no relation to the defendants, that she submitted to a criminal operation a short time after the wedding at her husband's request. When the objection was interposed, plaintiff's counsel stated that if counsel for both defendants assented to that proposition he did not wish to introduce the evidence, and on that suggestion it was excluded. When defendants' counsel announced that they only asked to have the evidence excluded then, but waived no right to put it in as part of defendants' case, the offer was renewed, and the evidence admitted under exception. It was not error to overrule the objection. The admissibility of the evidence did not depend upon the defendants having anything to do with the affair. Several grounds of admissibility could be mentioned. It is enough to say that the fact Douglas instigated the abortion would tend to negative the claim that there was anything about the operation to furnish reasonable cause for defendants' interference. It would also tend to negative the claim that Douglas' affections had cooled by reason of plaintiff's pregnancy and this operation, and that his abandonment of the plaintiff was in part the result thereof.

[38]     Plaintiff was testifying to attempts made to get into communication with Douglas during the summer of 1920. Plaintiff's Exhibit 154 was an envelope marked "special delivery," bearing special delivery postage, addressed by the plaintiff to Douglas at the New York address of the defendants. It bore evidence on its face of having been forwarded to Chatham, Mass., where Douglas then was at the defendants' summer cot-

tage. The letter was returned through the mail to the plaintiff. The envelope was offered in connection with the testimony of the plaintiff for the purpose of showing that Douglas was concealing himself from her, and was received "for what it purports to show—it was refused at the place of the postmark—as tending to show it came back to her." The objection was that the exhibit was immaterial—could not affect the defendants unless they were connected with it in some way—and that the marks on the envelope would not be evidence tending to show that it was refused by anyone connected with the case. It is quite probable that the exhibit was properly received in evidence, but it is unnecessary to decide that question. Later, and before it had been shown to the jury, the court reversed its ruling and excluded the exhibit. It is now urged that this did not cure error. It is argued that the impression "made upon the mind of the jury" would not be removed by the withdrawal of the exhibit without instruction to disregard claims made when the envelope was offered in evidence. This would seem to be an afterthought. If counsel then thought that such an instruction was desirable they should, and probably would, have requested it. It must be held that reversible error is not shown.

[39, 40] Another group of exceptions challenge the admissibility of evidence concerning Douglas' flirtation with Mrs. MacClelland on the ground that the acts were unconnected with the defendants. An exception was taken to the admission of the questions and answers on several pages of Mrs. MacClelland's deposition taken and offered in evidence by the plaintiff. This covered evidence of her relations with Douglas from their first meeting in December, 1919, until she met the defendants in Washington about May 1, on their return from Florida. The claim of the defendants was that they knew nothing about what took place between Douglas and Mrs. MacClelland before that time, that they were not responsible for it, and that it was not evidence against them. Plaintiff's counsel advanced the claim that there was evidence tending to show the defendants knew what was going on. However, the court did not admit the testimony on that ground, but rather on the ground that it tended to show alienation. Defendants argue at length the proposition that there was no evidence that they knew anything about the incidents covered by this testimony. But they in effect concede the correctness of the ruling when they say "the MacClelland

incident may be evidence of alienation, but it is not evidence of resulting alienation as to these defendants.'' Causal connection between the acts of the defendants and the alienation must, of course, be shown; but the admissibility of evidence tending to show the alienation and loss of consortium is not dependent upon the defendants' knowledge of or connection with the events. The connection may be established by other evidence. Nor would the questioned evidence be rendered inadmissible by the fact that in a possible view it tended to show that Mrs. MacClelland was in part the cause of the alienation. To that extent the evidence would be favorable to the defendants, and it is not likely that they failed to make the most of it. The assignments of error 79, 80, and 81 are of the same character, and do not require separate treatment.

[41]    Assigned error 82 refers to two questions and answers in the MacClelland deposition. In the first the witness testified that she met the plaintiff on Palm Sunday, 1920. The objection to this was that it occurred without the knowledge of the defendants, which presents the same question as the exceptions last treated. The other objection was to part of the answer to the question, ''What happened then?'' The objection was sustained, and only the part of the answer not objected to was admitted in evidence. Under this assignment of error the defendants argue an objection to the further testimony to the effect that the witness then learned from the plaintiff that Douglas was married. But the question is not before us, not being referred to in the specification of errors relied upon by the defendants which is made a part of the record. If it were otherwise, the exception could not be sustained, as it does not appear that the defendants could possibly have been prejudiced.

[42, 43]    Assigned error 84 relates to the admission of Mrs. MacClelland's testimony that some time after meeting the plaintiff she had an interview with Douglas and her brother in which ''this alleged divorce was discussed.'' It apears that the evidence was received, against the objection that it did not affect the defendants, upon the suggestion of plaintiff's counsel that it showed the probability of defendants' knowledge of the matter from the notoriety of it. That it had no such tendency may be conceded; but it does not appear that the court admitted the evidence on that ground, or that it was made the basis of any such argument—the presumption would be to the contrary.

The defendants cite *Farmer* v. *Williams,* 92 Vt. 132, 134, 102 Atl. 932, to the proposition that the evidence had no probative value, but since the court admitted it, it gave ground for a fallacious claim and argument calculated to mislead the jury. This assumes both that the evidence was immaterial and that it afforded the basis of the alleged fallacious argument, neither of which affirmatively appears. The evidence would not be the legitimate basis of any such argument, which would be necessary to bring it within the case cited; and, to sustain an objection on the ground of immateriality alone, it must appear that the evidence is clearly irrelevant. *Gomez & Co.* v. *Hartwell,* 97 Vt. 147, 155, 122 Atl. 461. The. circumstance is a link in the chain of circumstances already held to be material on the question of alienation. Standing alone, it corroborates Douglas' testimony respecting what he told the brother concerning a prospective divorce, which was admitted without objection. It follows that the evidence cannot be said to have no probative value. The objection that the evidence did not affect the defendants raises a question already sufficiently considered.

[44] Against the objection that there was nothing to show that the defendants knew anything about it, this question and answer in Mrs. MacClelland's deposition were received in evidence: "Q. Did they (the defendants) say anything at all to you to indicate that they disapproved his (Douglas) former status toward you? A. No." Their admission is the basis of assigned error 85. This was one of a series of questions and answers of the same tenor, which with the single exception were received in evidence without objection. It necessarily follows that harmful error is not shown. However, the question related to a time when there was evidence tending to show that the defendants did know of Douglas' relations with Mrs. MacClelland, hence the objection was groundless. The point that silence would be no evidence against the defendants as they were under no legal obligation to speak is made for the first time here, and so is not noticed.

[45] Testimony in Douglas' deposition had been admitted to the effect that while at Reno he had correspondence with Mrs. MacClelland with reference to the return of some rings which he had given her, and that he had been in sufficiently close touch with her to know what had taken place from time to time with reference to the alienation proceedings. Inquiries followed that

were excluded, to which witness had given evasive answers. He was then shown what purported to be the transcript of his testimony in some matter connected with his divorce proceedings, and stated that his recollection was refreshed thereby. Then followed the testimony which is the basis of assigned error 61, to the effect that he heard from Mrs. MacClelland about a proposal referred to in that testimony some week or ten days thereafter. What the proposal was does not appear. The objection was that the witness had no knowledge when the incident referred to occurred; that so far as it was within his knowledge, it was hearsay; that the evidence had no tendency to establish the time that had elapsed; that it was entirely immaterial and incompetent. The defendants discuss the effect of this testimony as though it had been offered to show the event referred to, claiming that it was pure hearsay. Douglas' information concerning the proposal referred to would be hearsay; but his testimony as to the length of time that elapsed before he heard from Mrs. MacClelland about it would not be open to that objection. It cannot be said that the testimony was clearly irrelevant. The plaintiff was undertaking to show by circumstantial evidence the true relation between Mrs. MacClelland, Douglas, and the defendants as bearing upon the issues in the case. The fact that each was keeping the others informed respecting events connected with the affair was relied upon as tending to support plaintiff's claim.

[46] Assigned errors 58, 59, and 60 relate to what is referred to as the "rubber stamp matter." The testimony covered by these exceptions is found in Douglas' deposition, and was, in substance, that his father had a rubber stamp made some time as early as January, 1920, for use in forwarding Douglas' mail from the father's home in New York to the Wardmann Park Hotel, where Douglas lived during his stay in Washington. The relevancy of this circumstance appears when the claims of the parties are recalled. The plaintiff was claiming that Douglas went to Washington for a permanent stay when the defendants left their New York home for Florida, and that this was part of the plan to bring about the alienation. The defendants denied all connection with Douglas' going to Washington, and particularly any knowledge that he intended to remain there when he accompanied them as far as Washington on their way to Florida. It would be a fair inference from this evidence that the father

at least understood that Douglas' stay at the Wardmann Park Hotel was to be of a somewhat permanent nature. The evidence was clearly admissible for the purpose offered, which was to connect the father with Douglas' presence in Washington.

[47] Olga Roosevelt Bayne was a cousin of defendant L. E. Woodhouse who lived in Washington. She introduced Douglas to Mrs. MacClelland upon his arrival in Washington and was acquainted with their relations during Douglas' stay there. Defendant L. E. Woodhouse was being examined as a witness called by the plaintiff and had testified that he and his wife and daughter Marjory stopped off in Washington on their way north from Florida in May, 1920; that when there Douglas brought Mrs. MacClelland to the hotel where they were stopping and introduced her; that he spent part of the afternoon with Mrs. Bayne; that he had something to do with her as trustee. Thereupon, he was asked, "Q. And your relations with her were confidential and friendly, were they not?" An affirmative answer was admitted against the objection that it was immaterial, and an exception was reserved in behalf of the defendant Mary Woodhouse. Defendants advanced the claim in their brief that this evidence was used by the plaintiff as a basis for the claim that Mrs. Bayne must have known of Douglas' affair with Mrs. MacClelland, and because of these confidential and friendly relations with L. E. Woodhouse must have communicated that fact, whereby the defendants knew all that was taking place in Washington. Our attention is not called to anything in the record to support this claimed misuse of the evidence. Moreover, we are to review the ruling as the question was presented to the trial court. The witness being a party, the examination was being conducted as in cross-examination. We are unable to find affirmatively that in the circumstances the admission of the evidence violated the rules respecting such examination.

[48, 49] Plaintiff had testified to circumstances showing Douglas' estrangement from her, his absence in the Maine forest, her inability to discover his whereabouts, the search made for him, that she had not seen him after November 3, 1919, nor heard from him after January 5, 1920, until on March 14, 1920, she discovered him on the street in Washington with Mrs. MacClelland. Against the objection that it was immaterial she was then permitted to testify to the injurious effect upon her health of Douglas' absence, of her inability to find him, and her lack

of knowledge where he was. The evidence was clearly admissible on the question of damages. The claim that there was nothing in the case to connect the defendants with this absence has already been adverted to. Evidence of causal connection was not lacking. If the jury found therefrom that the defendants were the controlling cause of the estrangement, they would be liable for the consequential damages of whatever nature. Damages for mental and physical suffering occasioned by the alienation would be recoverable as the natural and probable result thereof. It would be no answer that during the time in question the defendants did not know of Mrs. MacClelland's existence and had no part in Douglas' flirtation with her.

[50]  Defendant L. E. Woodhouse was being questioned respecting his knowledge of Douglas' relations with Mrs. MacClelland prior to meeting her in Washington and had denied any such knowledge. He was then asked what the relations between his family and Mrs. MacClelland were following the Washington visit and testified that it was simply a casual acquaintance brought on by the event in Washington. This was followed by the question and answer which are the subject-matter of the fourth assignment of error: "Q. What I want to know is whether you regarded that woman who was placed by you as matron of honor at the wedding of your daughter as a casual acquaintance? A. Exactly." Following the answer defendants' counsel objected to the evidence as immaterial, giving as the reason for the objection that Mr. Woodhouse did not place her there. The court denied a motion then made to strike out the evidence, assigning as a reason that the answer was on the record without objection. It is argued in support of the exception taken to this ruling that the action of the court was an abuse of discretion. The only complaint is that the question contained the erroneous assumption that the witness conferred the honor upon Mrs. MacClelland. It was undisputed that Mrs. McClelland served as matron of honor at the wedding, but there was a disagreement as to how she came to be selected, the plaintiff undertaking to show that it was by choice of the defendants. In the circumstances the question was proper cross-examination. The question was not calculated to mislead the witness and the answer was responsive. The defendant had ample opportunity to modify his answer if not given understandingly. The defendants fail to show that they were injured

by the refusal to strike out, in the absence of which there would certainly be no abuse of discretion requiring a reversal.

[51, 52]  Another group of exceptions relate to evidence admitted against the defendants of acts which it is claimed they had a right to do, upon the theory that the acts were a breach of duty toward the plaintiff.  Assigned errors 43, 44, and 46 of this group do not require attention, as the record does not disclose that any ground of objection was assigned below.  Douglas had testified concerning what he characterized as a struggle with himself, and that he was in a grievous quandry what he was going to do regarding his marital affairs.  In this connection he had stated that he did not then hope for a reconciliation of his parents with his wife.  He was then asked, "Did you consider it hopeless to try to get them to recognize her as a member of the family?" and answered in the affirmative.  This question and answer were admitted in evidence over the objection that it called for the opinion of the witness without giving anything upon which the opinion was based.  The theory of the defendants is that if Douglas had given his reason for the opinion, it undoubtedly would have been the indifference of his parents, and that indifference is not a breach of duty.  The obvious answer is that the question did not call for a matter of opinion, but for the witness' state of mind.  It was direct evidence of the effect of the defendants' conduct upon Douglas which bore upon the ultimate question of alienation.

[53]  The plaintiff was undertaking to show by Douglas the defendants' interference in his marital affairs.  He was an adverse witness, and the plaintiff was forced to resort mainly to circumstantial evidence to prove the fact.  During the time to which the evidence presently to be noticed relates the plaintiff was staying at Westfield, Mass., and Douglas was at the defendants' summer home on Long Island.  He admitted that he was then in trouble over his marital affairs, but denied that the defendants were connected with it.  A contemplated trip to Westfield about September 1, 1919, had been postponed.  He was asked if he recalled anything happening between him and his parents which caused the postponement and answered in the negative, "unless that was the time my sister got into trouble." Letters identified as written by him to the plaintiff at this time were shown the witness to refresh his recollection.  Then came the questions and answers on which assigned error 50 is based:

"Q. Now, having read that letter is your mind refreshed upon the subject of whether the sister's troubles interfered and practically stopped your negotiations there in East Hampton for a few days? A. Oh yes, it upset me for two or three days. Q. Did it upset anyone else there in the house? A. It did. Q. Who? A. Mother and father." The only objection requiring special notice was that the question assumed "the existence of negotiations not in the case." It is urged that because of the assumption the admission of the evidence was harmful error. This would not necessarily follow if the nature of the negotiations did not elsewhere appear. The admissibility of the question is to be tested by the rules of cross-examination. But the jury were not left to speculate as to what the negotiations were. On the whole evidence their nature and the defendants' connection therewith fairly appeared. Assigned error 51 is unsupported by any objection below. This and assigned error 52 cover questions closely related to those last quoted. They merit no further attention.

[54]   In the same connection, having testified that as soon as his father's frame of mind was restored he had hoped to do something with him, but had not succeeded, Douglas was asked, "About this time were you convinced that you must either find an independent means of support for yourself and your wife or separate from her?" to which he replied, "The question had not come up for my consideration." The point argued was not raised by the objection, which was merely that the question was immaterial. It is apparent on the fact of the question that an affirmative answer would have been material. The answer was in effect a denial of the fact called for. For either of these reasons the exception, which is assigned error 53, must be overruled.

[55-57]   Assigned error 86 questions the admissibility of evidence of a statement made by L. E. Woodhouse some time in October, 1921, to the effect that he had nothing more to do with Douglas, that he had disinherited him on account of his escapade with the plaintiff, but that he hoped he might be reinstated in the family at some future time. The objection taken that the evidence was immaterial is the principal ground of the claimed error. It is argued that disinheritance on account of a marriage not approved is a right of the parents. While that may be so as an abstract proposition, disinheritance for the mali-

9

cious purpose of alienating Douglas' affections for the plaintiff would be an actionable wrong. It should require no argument that evidence of an admission of one of the things charged against the defendants was admissible, at least against the one making it. It is of no importance on the question raised that the statement, if made, followed the alienation. Such an admission is not inadmissible because made after the act had been accomplished. The claim that the statement was not admissible against defendant Mary Woodhouse, because made after the accomplishment of the alienation is not covered by the objection made when the evidence was offered. In admitting the evidence against the objection, which was general, the court remarked that if no connection was made as to defendant Mary that could be taken care of later. In the absence of any showing to the contrary, it will be presumed that the connection was made or that the evidence was properly restricted.

[58] The remaining assignment of error in this group was to the admission of the following question and answer in Douglas' deposition: "Q. Did you feel forced to take a position in favor of one and against the other? A. The same position I always had." They come at the close of testimony relating to his mother's treatment of the plaintiff in Douglas' presence when sick at the hospital. He had testified in this connection that his mother came into the room in the hospital where he and the plaintiff were, and that, upon seeing the plaintiff there at his bedside, she turned her back on the plaintiff and abruptly left the room without speaking to her; that he did not feel offended at his mother's conduct; that it made an impression of annoyance upon his mind; that it was apparent to him there was hostility between his mother and the plaintiff—that there was no peace between them; and that his annoyance was directed against both of them. Then followed the question which was objected to as immaterial and incompetent. It is urged that at most the mother's act was the exercise of her lawful right not to recognize the plaintiff, and that its effect on Douglas was immaterial. Enough has already been said respecting the test to be applied to the conduct of parents in such circumstances to show that the mother's action and its effect upon Douglas had an important bearing on the issues in the case. It follows that the objection was not well taken.

[59, 60] Numerous exceptions are grouped as "specimens

of wholly immaterial testimony'' admitted against the bare ob-
jection that the evidence was immaterial. As said above, to
sustain such an objection it must appear that the evidence has
no relevancy to any issue in the case. Plaintiff was permitted
to testify that sometime before her marriage she gave up plans
she had made to do settlement work at Douglas' request. This
circumstance tended to characterize their relations and to show
mutual affection. The objection now urged that the testimony
related to a time long prior to marriage raises the question of
remoteness, which is not for consideration. The exception to
the admission of plaintiff's testimony that she cancelled a certain
invitation to dinner at Fort Ethan Allen at Douglas' request
presents a similar question. The evidence related to a time
after their engagement while Douglas was in an officers' train-
ing camp. He had written the plaintiff a very affectionate letter
containing the admonition, ''Be a good girl, Dottie, and don't
go playing around the Fort for it stirs me all up.'' The letter
was material to show Douglas' affection for the plaintiff. To
meet any possible inference from the sentence quoted that the
plaintiff had offended Douglas by going to the Fort against his
wishes, it was permissible to show the contrary.

[61] Another letter from Douglas was produced for the
purpose of showing his affection for the plaintiff. It made refer-
ence to congratulations extended to both of them by a person
named in the letter. Referring to this part of the letter, the
plaintiff was asked what, if anything, occurred with reference to
the engagement about the date of the letter. Testimony that the
engagement was announced to the person named in the letter
was admitted against the objection that it was immaterial unless
the defendants knew about it. Several answers to the objection
could be given, but it is enough that the evidence was material
to a complete understanding of matters contained in the letter.
Besides, Douglas had testified to the same thing in his deposi-
tion, which came in without objection.

[62] The plaintiff had testified about Douglas' trip to
Florida with his parents after his recovery from the sickness
at the hospital, leaving her alone at Long Branch; and that later
while Douglas was in Florida she went to Louisville, Kentucky.
Testimony that she went there to take care of some cousins who
were suffering from influenza and pneumonia was admitted
against the general objection that it was immaterial. However,

the evidence was plainly admissible. The defendants were claiming that the plaintiff remained behind because of a previous arrangement for a visit to Louisville, while plaintiff's evidence tended to show that she was excluded from the Florida trip by the interference of the defendants. Why she went to Louisville was thus a material issue in the case.

[63-65]  Defendants treat assigned errors 63 and 95 together. The former relates to the admission of testimony by Douglas that he was not in Burlington at the time of the meeting of the directors of the Merchants National Bank in September, 1920. No objection to this evidence was specified; and the exception is merely referred to which is not adequate briefing. The exception which is assigned error 95 was taken in the following circumstances: The plaintiff undertook to prove interference by defendant L. E. Woodhouse with her credit at F. D. Abernethy's store where she had run an account on Douglas' credit. During plaintiff's examination of witness Hill, his attention was called to the record of a meeting of the directors of the Merchants National Bank on September 22, 1920, whereupon a discussion ensued as to the purpose of the inquiry. Plaintiff's counsel made an offer to show that defendant L. E. Woodhouse and F. D. Abernethy were present at the meeting; that Douglas was not then in Burlington, and it was not known where he was; that following the meeting the plaintiff was notified that her credit at Abernethy's for clothing was terminated—that she could not get any more clothing there on the credit of her husband. This was offered in connection with evidence that Douglas had not then notified any merchant not to trust the plaintiff as tending to show interference by defendant L. E. Woodhouse with plaintiff's living. The offer was objected to as having no tendency to prove what was claimed for it. The ruling of the court was, "We will receive this evidence on the offer that is made and defendants may have an exception noted." At this time no question was pending. Witness was then asked whether L. E. Woodhouse and F. D. Abernethy were present at the meeting of the directors September 22, 1920, whereupon counsel for defendants said: "We desire our objection and exception noted to this." Without directing that an exception be noted the court admitted the answer, "the full board was present." By a question not objected to the witness testified that both persons named were members of the board of directors and were both

present. It would seem that it was understood that the exception to the offer covered this evidence.

The plaintiff testified she was notified about the 24th or 25th of September that her credit at the Abernethy store was cut off. Defendants' evidence tended to show that no such notice was given, and not that there was any other reason for the action than that claimed by the plaintiff. Considering all the circumstances, we are unable to say there was no logical connection between the evidence objected to and the termination of plaintiff's credit, which, so far as it relates to the pending question, must be assumed. The sudden and unexplained termination of a credit which had so recently been approved strongly indicated interference by someone. The evidence excluded Douglas, the only one who would naturally be interested. There was ample evidence of motive on the part of the defendants, and especially defendant L. E. Woodhouse. The evidence in question was merely evidence of opportunity. Counsel argue as though the correctness of the ruling depended upon the claim that proof of opportunity to ask Mr. Abernethy to cut off the credit was all that was needed to support the inference that this was done by the defendant L. E. Woodhouse. However, that is only one, and possibly not an indispensable circumstance tending to prove the ultimate fact. The plaintiff was forced to depend wholly upon circumstantial evidence to establish who it was that interfered with her credit. The rule respecting the admissibility of such evidence is thus stated in *State* v. *Ryder*, 80 Vt. 422, 426, 68 Atl. 652, 654: "Proving things by circumstantial evidence is a process of imperfect induction, by which, from the known we infer and find the unknown. But circumstantial evidentiary facts are too various to admit of enumeration, for they are as changeful as the events out of which they grow. They cannot be comprehended within any rule, nor brought under any classification. Great latitude is allowed in their reception, and everything that tends to connect the supposed evidentiary fact with the *factum probandum*, is admissible to prove that fact." Applying this test to the evidence excepted to, there should seem to be little doubt that it was properly admitted. See *Barney's Admx.* v. *Quaker Oats Co.*, 85 Vt. 372, 384, 82 Atl. 113.

[66, 67] Certain exceptions argued were taken to the admission of evidence of the wealth of defendant L. E. Woodhouse.

This evidence was in part offered as bearing upon the question of alienation and in part upon that of exemplary damages. As to the former, plaintiff introduced evidence tending to show that Douglas had been disinherited by his father because of his marriage, and that financial pressure had been brought to bear upon him to accomplish the alienation. During the discussion of certain objections to the admission of evidence of the wealth of L. E. Woodhouse on the question of exemplary damages, the court ruled that evidence of his wealth at the time of alienation would in the circumstances be admissible on the question of liability. Exceptions to this ruling are argued separately. Plaintiff insists, not without show of reason, that the objections to this line of evidence came too late, as before that time some evidence of the wealth of both defendants had been introduced without objection. However, we do not find it necessary to consider that claim. It is not seriously contended that evidence of defendants' wealth would not be admissible, if the circumstances are as claimed by the plaintiff. *Knapp* v. *Wing*, 72 Vt. 334, 47 Atl. 1075, supports the proposition that it would then be admissible. The defendants attempt to distinguish the case at bar by claiming want of evidence to bring it within the doctrine of *Knapp* v. *Wing*. The claim principally relied upon is that there was no evidence Douglas knew the amount of his father's property, and, as well, no evidence of any threat of disinheritance brought home to him. But the connecting evidence was not lacking. While Douglas testified he didn't know his father's wealth, the circumstances afforded ample evidence that he knew in a general way what the fact was. It would not be necessary to show more, if indeed more was admissible on this branch of the case. See note 16 A. L. R. 840; note Ann. Cas. 1915B, 1160. The threat of disinheritance and Douglas' knowledge of it was also on the evidence a question of fact for the jury. The denials relied upon were not conclusive of that matter. The evidence of declarations by defendant L. E. Woodhouse, in connection with circumstances tending to show that financial pressure played an important part in bringing about the alienation, would afford a sufficient basis for an inference that the threat of disinheritance was in fact made. It is no answer that the defendants would have a right to disinherit Douglas because they were displeased with the marriage. They

would not have a right to use the threat of disinheritance as a club to accomplish a wrongful purpose.

[68-70]   The principal objection to the admission of the evidence respecting the wealth of L. E. Woodhouse offered as bearing upon the question of exemplary damages was in substance this:   With evidence of the wealth of defendant Mary Woodhouse in the case, it would not be permissible to show that L. E. Woodhouse was worth a larger sum.   Stated briefly, the defendants' claim was that, in a case where there are two or more defendants, evidence of wealth offered upon the question of exemplary damages is limited to showing the wealth of the one who has the least.   With certain minor differences, which for practical purposes are unimportant, the assignments of error in this group present the same question.   Assigned error 104 is the only one requiring separate treatment.   It is clear that this exception does not present reversible error.   It is based on an objection addressed to the order of proof, which is a discretionary matter.   Besides, the evidence admitted under the exception was manifestly harmless.

At the close of a somewhat lengthy discussion, the court announced the rule under which the evidence of the wealth of L. E. Woodhouse was admitted on the question of exemplary damages.   As received it was limited in its application to a possible verdict against L. E. Woodhouse alone.   The rule was adhered to throughout the trial, and in the charge the jury were carefully instructed with reference to the matter.   The fundamental question is whether the court erred in receiving evidence of the greater wealth of L. E. Woodhouse to be used only in assessing exemplary damages in case the verdict should be against him alone. Objections that the foundation had not then been laid for receiving such evidence went to the order of proof, and are not now important, for later, at least, the evidence made a case for the jury on the question of exemplary damages.   We are not aware that the precise question has before arisen in this jurisdiction.   In fact our attention is not called to any case in other jurisdictions precisely in point.   *Washington Gaslight Co.* v. *Lansdon,* 172 U. S. 534, 43 L. ed. 543, 19 Sup. Ct. 296, is the case most relied upon by the defendants and is doubtless a leading case on the question there decided, *viz.:* That, as the verdict must be for one sum against all the defendants who are guilty, when a plaintiff voluntarily sues several parties as de-

fendants, he must be held thereby to waive any right to recover punitive damages against all founded upon the ability of one of the several defendants to pay them. This in substance is the holding in practically all the cases cited by the defendants. The proposition that the wealth of one defendant should not be made the basis of assessing exemplary damages against other and poorer defendants bears no analogy to that relied upon by the defendants in the instant case. It is quite apparent that *Washington Gaslight Co.* v. *Lansdon* does not go to the extent claimed by the defendants, for the opinion states that the rule announced does not prevent the recovery of punitive damages in all cases where several defendants are joined. It is suggested in this connection that what the true rule is in such case may not be certain, citing *Pardridge* v. *Brady,* 7 Ill. App. 639, and *McCarthy* v. *DeArmit,* 99 Pa. 63. In the former case it was held that, if a plaintiff makes a case for exemplary damages against one of two defendants and not against the other, he may dismiss as to the latter and have his recovery for exemplary damages against the other. The McCarthy case holds that exemplary damages should be assessed according to the acts of the most innocent of the defendants, and that, if any defendant was not liable for such damages, none should be included in the verdict. It is observed, "In such case, if the plaintiff means to get exemplary damages he should proceed against the party which ought to be punished in that way."

*Clark* v. *Newsam,* 1 Exch. 130, is frequently cited. There Pollock, C. B., speaking of a case where one of several defendants was not liable for punitive damages, says: "It is difficult to say that there are no cases in which the motives of the parties (two or more defendants) would be important, still I think it would be very unjust to make the malignant motives of one party a ground of aggravation of damages against the other party who was altogether free from any improper motive. In such case the plaintiff ought to select the party against whom he means to get aggravated damages." Some courts have given this and similar observations a different meaning than we attach to them, as the cases are cited by them to the proposition that the wealth or financial standing of one defendant cannot be shown for the purpose of augmenting damages against him, because the admission of such evidence necessarily has the effect of improperly augmenting the damages against the other de-

fendants.   This in effect is the holding in *Walker* v. *Kellar*
(Tex. Civ. App.) 218 S. W. 792; *McAllister* v. *Kimberly-Clark
Co.,* 169 Wis. 473, 173 N. W. 216; *Schafer* v. *Ostmann,* 148 Mo.
App. 644, 129 S. W. 63; *Leavell* v. *Leavell,* 114 Mo. App. 24,
89 S. W. 55.

The argument in these cases is faulty, in that it assumes that
the admission of evidence on the question of exemplary damages
against one of the defendants necessarily has the effect indi-
cated.   It has such effect only when there is a verdict against
both defendants, assessed on the basis of the ability of the most
wealthy defendant to pay.   It will be found that the rule gen-
erally adopted is no broader than the evil to be prevented.   When
*Schafer* v. *Ostmann, supra,* was retried, one of the defendants
was discharged during the course of the trial.   In an opinion
sustaining the judgment against the remaining defendant, it
was said that it was proper to take into consideration his finan-
cial condition in assessing exemplary damages.   In *Gagen* v.
*Dawley,* 162 Wis. 152, 155 N. W. 930, the evidence of financial
condition of one of several defendants was received generally
on the question of exemplary damages.   Subsequently the jury
were instructed that exemplary damages could not be recovered
against that defendant, and they were directed to disregard the
evidence of his wealth.   It was held that the admission of the
evidence was not reversible error.

The controlling principle is tersely but comprehensively
stated in *Weir* v. *McEwan,* 94 N. J. Law, 92, 109 Atl. 355: ''The
rule is that only such damages for which they are jointly liable
can be recovered from joint tort-feasors by a joint verdict.''
It is said in *Toledo W. & W. R. Co.* v. *Smith,* 57 Ill. 517, that,
when the plaintiff is entitled to exemplary damages by reason
of the conduct of the defendants, the pecuniary ability of one
defendant should not be considered by the jury in determining
the damages to be assessed jointly.   To the same effect are *Chi-
cago City Ry. Co.* v. *Henry,* 62 Ill. 142; *Sugar Mfg. Co.* v.
*Bryant,* 105 Va. 403, 420, 54 S. E. 320.

*Lombard* v. *Batchelder,* 58 Vt. 558, 5 Atl. 511, and *Moore*
v. *Duke,* 84 Vt. 401, 80 Atl. 194, are said to decide the precise
point; but such is not the fact, though they are somewhat analo-
gous.   The only question in the former case was whether exem-
plary damages were recoverable against husband and wife in
an action against them for the malicious trespass of the wife,

the husband being free from blame in the premises. The general rule as stated in *Clark* v. *Newsam, supra,* is referred to but not applied because of the liability of the husband for the torts of the wife by reason of her coverture, as the law then stood. The remark that, if the plaintiff proceeds against all, he thereby deprives himself of the right he otherwise would have had to claim exemplary damages was beside the question; but evidently it was not intended to convey the meaning attributed to it by the defendants, as in that event it would not be supported by the cases cited. Nor does *Moore* v. *Duke,* 84 Vt. 401, 80 Atl. 194, support the defendants' claim that the bringing of the suit against the joint defendants is determinative of plaintiff's rights respecting exemplary damages. That case decides no more than that punitive damages are to be assessed according to the guilt of the most innocent of the defendants; and if any one of these was acting in good faith and so not liable for such damages, that none can be awarded in the suit. This statement implies a verdict against all of the defendants. The further statement specially relied upon that the plaintiff "must elect against which party he will seek aggravated damages," relates to the case where one of the defendants is innocent of the offense for which they are the punishment. Then, of course, to secure exemplary damages the plaintiff must proceed against the guilty defendant or defendants alone. But it does not follow that the bringing of the suit against all concludes the plaintiff. He may discontinue against the innocent defendant during the trial and proceed against the defendants who on the evidence are liable for punitive damages. *Schafer* v. *Ostmann, supra; Pardridge* v. *Brady, supra.* There would seem to be no valid reason why the jury may not include exemplary damages in their verdict, if rendered only against the defendants that are liable for such damages, that is, if their verdict is in favor of the innocent defendant. We find nothing to the contrary in our cases, including *Boutwell* v. *Marr,* 71 Vt. 1, 11, 42 Atl. 607, 43 L. R. A. 803, 76 A. S. R. 746.

[71]  Plaintiff argues that actions for alienation in which the parents of the alienated spouse are joined as defendants are an exceptional class with respect to exemplary damages because of the relationship of the property of each upon the social status of the other. If it were a mere question of social status there would be some force in the argument; but the primary purpose

of evidence of the financial condition of the defendant on the question of punitive damages is to ascertain his ability to respond in such damages. Under the existing law the individual liability of husband and wife as joint tort-feasors is unaffected by the marital relation. The doctrine of *Lombard* v. *Batchelder, supra,* is no longer applicable. *Story* v. *Downey,* 62 Vt. 243, 246, 20 Atl. 321; G. L. 3526. The same reason now exists for applying the rule to husband and wife that is applied to other joint wrongdoers. In the instant case, to use the greater wealth of the defendant husband as a basis of assessing exemplary damages against both defendants would subject the now separate property of the wife to payment of punitive damages based upon the ability of the husband to pay, against whom she would have no redress or right of contribution.

[72] It seems clear that the true rule is that, when the action is against several defendants, the financial condition of one cannot be used as a basis for determining the amount of exemplary damages against any other, unless that one is the least wealthy of all; but that evidence of the financial condition of the individual defendants may be admitted to be used only against the particular defendant in case the verdict is against him alone. There is no peculiar difficulty in applying to the situation here the ordinary rule respecting the admission of evidence to be used against a single defendant in actions where the liability is severable. While we find no case directly in point, we think this is the logical result of analogous decisions.

[73, 74] The claim is made that the evidence of the wealth of the individual defendants was outside the issue and so inadmissible under the rule that the relevancy of the evidence is governed by the issues made by the pleadings. It is argued that the plaintiff is bound to proceed with the cause according to the pleadings, in other words, upon the theory of joint liability; and that to receive evidence contrary to this theory would be a departure from the issue and permit the plaintiff to take inconsistent positions. The claim is clearly untenable. Mr. Chitty says that where in point of law several persons may be guilty of the same offense, the joinder of more persons than were liable in a personal or mixed action in form *ex delicto* constitutes no objection, and one of them may be acquitted and a verdict taken against the others. On the other hand, if several persons jointly commit a tort, the plaintiff in general has his

election to sue all or some of the parties jointly, or one of them separately, because a tort is in its nature a separate act of each individual. 1 Chitty on Pl. *99. This Court has repeatedly held that defendants jointly charged with a tort can be held jointly or severally liable as the evidence warrants when case goes to the jury. *Beaulac* v. *Robie,* 92 Vt. 27, 31, 102 Atl. 88; *Wright* v. *Cooper,* 1 Tyler (Vt.) 425; *Moulton* v. *Moore,* 56 Vt. 700; *Town of Sharon* v. *Anahama Realty Cor.,* 97 Vt. 336, 123 Atl. 192. The rule is generally recognized that in actions against joint tort-feasors there may be a recovery against any or either of the defendants proved to be guilty. Note 14 Ann. Cas. 1142; 26 R. C. L. 781. As torts are in their nature several, the plea of not guilty, although two or more defendants join therein, is also in nature several. *Hayden* v. *Nott,* 9 Conn. 337. It necessarily follows, as the issues on trial included the separate liability of the defendants, that evidence directed to establishing such liability would not be irrelevant. A similar claim to that advanced by the defendants was made and overruled in *Lovelace* v. *Miller,* 150 Ala. 422, 43 So. 734, 11 L. R. A. (N. S.) 670, 14 Ann. Cas. 1139.

[75] Under several assignments of error the defendants complain of the method pursued in introducing the evidence of the financial condition of L. E. Woodhouse. Some of this group of exceptions are not sufficiently briefed to require attention, but we have examined all the matters complained of and find no error in the procedure. On the question of exemplary damages, it was incumbent upon the plaintiff to show the actual means of the defendants. *Rea* v. *Harrington,* 58 Vt. 181, 188, 2 Atl. 475, 56 A. R. 561. She was compelled to resort to the course that is criticized largely on account of the attitude of the defendants themselves. A reading of the transcript shows that the long and tedious cross-examination conducted to develop the essential fact was in no small measure the result of the defendants' obstructive tactics. In the circumstances we cannot say that the court exceeded the bounds of judicial discretion in permitting the inquiry to take the scope it did.

[76, 77] In another group of exceptions the defendants allege error in getting prejudicial matter before the jury through improper questions. It is a short answer to these assignments of error that the inquiries were properly in the form of cross-examination. As framed, affirmative answers would adduce evi-

dence that would be clearly relevant. That the questions were prompted by something that the witness had written did not make them improper, for the questions did not call for the contents of the writing. For the most, the answers were a denial, and so were harmless. We find no error in this group of exceptions, and only one requires further notice. Assigned error 159 was to the question asked the plaintiff on redirect examination, ''What was it that you referred to on cross-examination that stood in the way of reconciliation with Douglas?'' Against the objection that it did not grow out of the cross-examination, the witness answered, ''His subservience to his parents and his attitude and actions later.'' Plaintiff had testified in direct examination to attempts on her part to effect a reconciliation. The defendants undertook by her cross-examination to show that the plaintiff refused to live with Douglas because of his relations with Mrs. MacClelland and that that was what stood in the way of their reconciliation. This the plaintiff had denied. The fact appeared that her attempts at reconciliation had failed. Hence, the reason for the failure was material, and it was within the discretion of the court to admit the evidence, if not strictly redirect examination. The complaint now made that the question was improper because it assumed, contrary to the fact, that the plaintiff had referred to something on cross-examination, goes to the form of the question, and was not made the ground of objection below.

[78] The last group of exceptions to the evidence comprises assigned error 160. They relate to objection to a hypothetical question asked Dr. Beecher as an expert medical witness. He had testified to having treated the plaintiff in June, 1920; that he found a condition of extreme nervousness and mental depression; and that he could find no physical reason for her condition. After stating the facts to be assumed, the examiner asked the witness for his opinion respecting the cause of the plaintiff's condition in view of his examination and what he had stated in respect thereto. Witness answered that the stress and mental worry which plaintiff had been feeling were sufficient to occasion the condition from which he found her suffering. One fact recited in the question was that Douglas went to the Canadian woods from the home of his parents and that plaintiff did not see him again until she found him on the streets of Washington with another woman four months thereafter. Another was

that while in Texas the plaintiff learned that Douglas, upon sending her there, had returned to Washington and resumed a flirtation with the same woman. No claim was made that these facts did not appear in evidence, and the only objection to the question was that they were not "connected up with the defendants."

The sole purpose of the inquiry was to account for the nervous and mental condition of the plaintiff at the time in question. Whether such condition would enter into the assessment of damages would of course depend upon whether the causal connection with the alienation was made out to the satisfaction of the jury. Whether the defendants would be liable therefore would depend upon its being found that they were guilty of the alienation, and that plaintiff's suffering was the natural and probable result thereof. There was evidence, as we have already seen, making these questions of fact for the jury, which sufficiently answers the objection to the evidence. Other claims in the brief were not made below, and so are not for consideration.

## EXCEPTIONS TO ARGUMENT

[79]   Plaintiff's counsel in his opening argument was discussing the hospital episode in which the defendant Mary Woodhouse abruptly turned and left the room when she caught sight of the plaintiff at Douglas' bedside and was commenting that what occurred did not stand upon the testimony of the plaintiff against the defendant. The argument continued: "You have the testimony of that sick boy who got the full force of that blow, got the significance of it, who realized then that back of this snubbing was a history of cold and unnatural indifference to this girl throughout their entire courtship and at the time of the marriage that gave point, that gave force and effect upon his mind and his heart to her wheeling about and leaving him and his wife there, and it told him as plainly as could be that the reason she did it was because his·wife was there and because his wife was not a person that she cared to know." The exception taken was to the argument of acts and conduct prior to the hospital incident as cold and unnatural, "that being a claim abandoned by the plaintiff early in the case."

Defendants claim that the whole issue of hostility before the marriage was withdrawn by plaintiff's counsel in connection

with the admission of certain letters from Douglas to the plaintiff. All but two of the letters were written before the marriage. These were offered in evidence to show Douglas' affection for the plaintiff and that the marriage was not an escapade and did not furnish a justifiable excuse for the interference of the defendants. The two written following the marriage were offered for the additional purpose of showing that Douglas' peace of mind was not disturbed by the operation to which the plaintiff had submitted as bearing upon the question of its use to furnish legal justification for the interference of the defendants. It was objected in substance that the letters were written after the claimed interference commenced and at a time when the making of the statements would be open to suspicion of collusion. It was during the consideration of this preliminary question that the claimed withdrawal occurred. The plaintiff herself testified in the preliminary examination that she had no trouble with her husband, nor with anybody with reference to her marital relations, until the hospital episode. Douglas had testified to the same effect, and there was no evidence to the contrary. In the discussion of the matter before the court, plaintiff's counsel stated that his evidence would show ''no active interference with their married life until the hospital episode.'' In the same connection plaintiff's counsel was asked what was claimed by the fact that the defendants did not attend the wedding and replied, ''I claim nothing on this issue from that.'' The issue referred to was that raised by the objection to the admission of the letters. In effect this answer was a disavowal of any claim that the failure to attend the wedding was an act of interference or the occasion of any trouble between the parties, but went no further than that. Thus it is seen that neither the plaintiff's testimony nor the statements of her counsel justify the claim that the plaintiff was estopped to make the argument excepted to. Counsel was not arguing any active interference by the defendants before the affair at the hospital, and was only claiming that that incident had more effect upon Douglas because of the previous attitude of the defendants toward the plaintiff. The exception is not sustained.

[80] The following incident occurred in the closing argument for plaintiff: Counsel was speaking of what appeared in Dr. Slocum's deposition relating to the abortion, which had been developed during the defendants' cross-examination of the wit-

ness. He said in substance, "Who put that into the case? Did the plaintiff? No. These defendants put it into the case—they brought this in." The defendants asked 'for an exception to this argument. The court took the view that the defendants did not introduce the evidence, though they had made Dr. Slocum their witness on that subject, and that part of the deposition was not put into the case until the defense was reached. This view was based probably on the ground that the plaintiff had offered the deposition in evidence, though she had objected to the part in question, and it had been excluded as not being cross-examination. The court thus sustained the defendants' claim and told the jury not to consider the argument. Thereupon plaintiff's counsel recalled what occurred in the presence of the jury when he had asked the plaintiff "to recount the simple facts relating to this matter which they now try to trade upon" —how he had turned to the court and offered to leave the matter out of the case if they were willing to do so, which they declined to do. Defendants interposed the objection that it was improper to argue the objections of counsel—that an attempt at treaty between counsel was not proper matter for argument to the jury. The court again sustained the objection, and instructed the jury to disregard the argument in such a manner that defendants' counsel expressed satisfaction. Upon plaintiff's request for an exception to the exclusion of the argument on a ground stated defendants asked for an exception, to which the court replied, "You have said you were satisfied. If you are entitled to an exception you may have it." This occurrence does not present reversible error. There was some justification for the position taken by counsel in the argument. It is asserted without contradiction defendants' counsel had argued that plaintiff had paraded her shame and was at fault for the fact of the abortion being in the case. This being so, it was proper for plaintiff to show in reply that the defendants were responsible by their conduct for the fact appearing in evidence, though technically she had introduced it. There could be no doubt that the matter was handled by the court in a manner to cure the error, even if the argument was erroneous. Defendants' counsel evidently so regarded it at the time. The fact that plaintiff's counsel asked for an exception to the exclusion of his argument, even if done in the hearing of the jury, which is a disputed question, would not affect the result. It is not a question of an ineffectual with-

drawal of wrongful argument, which is the point argued in support of the exception.

Under this general topic the defendants argue assigned error 171. This was an exception taken to the overruling of their motion for a mistrial, made at the close of the final argument, on the ground of misconduct of those in the audience in applauding at the close of the argument. The court had administered a sharp rebuke and ordered the court room cleared. It is evident that the matter was dealt with as completely and severely as was possible. While deprecating the affair, the court stated they were not prepared to say that it was prejudicial to the defendants, and denied the motion. This matter was also relied upon as a ground for setting the verdict aside. The question is briefed on this exception only by reference to the brief on the latter motion. The point can more properly be considered when the motion to set the verdict aside is reached.

### EXCEPTIONS TO THE CHARGE

[81] The defendants made 47 requests to charge, and claim error in the refusal of all but nine of them, briefing each request separately. During the taking of exceptions to the charge, the court had before it the requests in writing. In excepting, the requests were referred to by number, and were followed by the court as they were referred to. The claim is made that the exceptions to the failure to comply with certain of the requests are under the rule too general to be available. The first 25 requests in varying form are directed to the claimed failure of the evidence to support the allegations of the declaration. In taking the exceptions, counsel said, referring to these requests: ''What I wanted there was this—those are numerous—I don't think it is necessary to read them, but I except as to each one from the first down to and including the 25th. Those are really each one put up in different forms asking the court to charge out certain propositions as not supported by the evidence. Also an exception to the non-compliance with the 26th, 27th, 28th, 29th, 30th, 31st, 32nd, 33rd, 34th.'' At this point, according to the record, the court gave a supplemental charge on a matter that had previously been called to its attention, after which the exceptor continued: ''Resuming my exception to the charge— going back to the 25th—my exception should be 'and so far as
10

the court attempted to charge on that subject'; and the 26th, 27th, 28th, 29th, 30th, 31st, 32nd, 33rd, 34th, 35th—if there was any charge on the subject—I except to the failure of the court to charge on those and to the charge on the subject of the request, whatever the charge was.'' Thereafter, the exceptor referred to the requests singly by number, either excepting to the failure to charge according to the specified request and to the charge given thereon, or to the failure to charge as requested and to the charge on that subject, if there was any whatever it was. In substantially one or the other of these forms exceptions were taken to all the remaining requests except the 40th, 41st, 43rd, and 47th.

It requires no extended argument to show that in the circumstances these exceptions are too general to require attention under rules with which the profession is entirely familiar. It should be observed that the exceptions were being taken at the close of a lengthy and complicated trial, replete with nice legal questions. The requests were exceedingly numerous and framed to cover every conceivable proposition that the case afforded. Justice to the court required that even unusual pains be taken to point out matters relied upon in the requests which it was claimed had not been adequately covered by the charge, and to indicate wherein the charge as given was claimed to be erroneous. The rule and the reasons therefor are too well known to require more than a reference to some of the recent cases. *Wilder* v. *Hinckley Fibre Co.*, 97 Vt. 45, 122 Atl. 428; *Eastern States Agricultural and Industrial League* v. *Estate of Vail*, 97 Vt. 495, 514, 124 Atl. 568; *McAllister* v. *Benjamin*, 96 Vt. 475, 490, 121 Atl. 263; *Platt* v. *Shields & Conant*, 96 Vt. 257, 267, 119 Atl. 520; *Morgan* v. *Gould*, 96 Vt. 275, 119 Atl. 517; *Duprat* v. *Chesmore*, 94 Vt. 218, 110 Atl. 305; *Bradley* v. *Blandin*, 94 Vt. 243, 110 Atl. 309. However, we have not omitted to examine the requests with the charge to be satisfied that no reversible error had been committed. Many of the requests do not require separate treatment, as they raise the same questions that are raised by the motion for a directed verdict and would be disposed of by what has already been said on that subject. The charge adequately stated the law of the case, and, on the points covered by the requests, was as favorable to the defendants as they were entitled to.

In connection with exceptions to the charge as given de-

fendants brief an objection to submitting the verdict against the two to the jury, upon the ground that there was no evidence tending to prove what is claimed by the plaintiff. If this is treated as an exception on the ground of the insufficiency of the evidence as claimed by the defendants, the question is disposed of by our holding on the motion for a directed verdict.

[82]  Commenting upon the charge, one of defendants' counsel said: "I cannot quote the court exactly but this proposition appeared twice and left it to the jury to make their own rule as to what is a proper inference to be drawn from a given fact * * * 'you may draw any inference you may consider just'." Strictly this does not amount to an exception to the charge. But if it were to be so considered, it could not be sustained, for the court nowhere told the jury, in fact or in effect, what the objection indicates. See *McAllister* v. *Benjamin,* 96 Vt. 475, 489, 121 Atl. 263. The charge on the subject was full and in all other respects satisfactory to the defendants. The point specially stressed in the brief that the court did not tell the jury what facts, if proved, would justify certain inferences was not indicated with sufficient definiteness in the objection to make the point available. *Morgan* v. *Gould,* 96 Vt. 275, 279, 119 Atl. 517; *Eastern States Agricultural and Industrial League* v. *Estate of Vail,* 97 Vt. 495, 514, 124 Atl. 568.

[83]  An exception was taken "to that part of the charge that she may now recover once for all and for all damages." The reason assigned for the exception was that it "overlooks the fact that she was then and is now drawing alimony from her husband." The part of the charge to which this exception was directed related to damages for loss of consortium, and particularly to the part concerning the question of prospective damages for such loss. The jury were told that in the event of a recovery the plaintiff was not limited to damages for loss of consortium up to the time of the trial, but would be entitled to damages also for such future loss of consortium as they found she would sustain. It is not claimed that the charge given was incorrect. It is argued that loss of support was one of the elements for which plaintiff recovered; that such loss would be mitigated by the fact that she was receiving alimony from her husband; and that the jury were nowhere instructed in the charge that liability for loss of support might be so mitigated.

If it should be admitted that on a proper showing the dam-

ages for loss of support ought to be reduced to the extent that the plaintiff's husband had contributed or might by law be compelled to contribute to her support, it by no means follows that error is shown by the exception taken. It was an exception to a definite part of the charge which is not challenged as being unsound. It was inappropriate as an exception to the charge as a whole on the question of damages for the omission now complained of. It does not appear that the defendant had previously made any claim during the trial for reduction of damages on account of alimony. The exception was not sufficiently specific to apprise the court of a claim that the receipt of alimony should be considered in reduction of damages, as appears from the court's findings on the motion to set the verdict aside. For these reasons the exception must be overruled.

[84]    In taking a further exception to the charge, counsel said: ''The court's charge was that if the jury believed the acts of the defendants were the controlling cause that would entitle her to a recovery and that does not discriminate as between the malicious acts and those which the defendants had a right to do, not illegal acts and permissive acts where malice overturns, and we think the charge on the whole holds the defendants responsible for acts which they had a legal right to do if they were done with ill will.'' The part of the charge referred to related to the issue whether the acts of the defendants, or either of them, caused the alienation. It was claimed that plaintiff's loss of consortium was due to her own fault. The language employed was appropriate to this issue and correctly stated the rule of law applicable to the situation. It is not a valid objection that this particular part of the charge did not discriminate between malicious acts and those which the defendants had a right to do. The only force to the objection, if any, is in the proposition that the charge as a whole made the defendants responsible for acts which they had a legal right to do. This is not a just criticism of the whole charge. It very carefully pointed out the peculiar rights of parents, so far as concerns the marital relations of their child, and laid down the principles governing liability for alienation of the child's affections in substantial compliance with the rules already announced in this opinion. The jury could not possibly have understood as now argued that they were at liberty to find against the defendants if their conduct was the controlling cause of the

alienation, although that conduct was in all respects lawful and constituted no breach of legal duty toward the plaintiff. This would be contrary to the whole spirit and tenor of the charge. The precise point of the exception that the defendants would not be liable for acts which they had a legal right to do though done with ill will was not well taken. Defendants' argument in that regard is based upon a contradiction. Acts maliciously intended to alienate their son's affections from the plaintiff could not be lawful acts such as were not a breach of duty toward the son's wife. This distinguishes the cases relied upon, which hold that when one exercises a legal right only, the motive which actuates him is immaterial. The controverted issues on the question of liability were, as we have seen, whether the alienation came about through the active interference of the defendants, or either of them, prompted by malice toward the plaintiff. The intent with which the defendants acted was the important consideration, and gave character to their acts. It follows that the charge was not erroneous in the respect indicated in the exception.

[85]   The exception "to the suggestion that they (the defendants) may have used influence without physical presence" as not applicable to the evidence in the case does not merit more than passing notice. The "suggestion" was made in connection with the part of the charge just referred to as follows: "The actual presence of the defendants, or either of them, during the process of the alienation is not necessary to be shown. It is enough, as I have said, that they or either of them had a controlling cause in producing it and such influence may have been exerted without their presence." That this is a correct rule of law is not questioned; nor could it well be. *Townsend* v. *Townsend,* 84 Vt. 315, 320, 79 Atl. 388. The objection that it was merely the statement of an abstract principle of law, if tenable, avails nothing. Unlike the cases cited, it introduced no issue outside the evidence and at most would be harmless error.

The exception "to the statement of the court that the case contains circumstances from which wrongful acts could be inferred, as not applicable to this case" presents a question already considered in connection with the motion for a directed verdict.

MOTION TO SET VERDICT ASIDE

The jury returned a verdict for the plaintiff. They assessed the compensatory damages at $400,000 and allowed $65,000 exemplary damages. The defendants moved to set the verdict aside, assigning as general grounds (1) that the verdict was excessive, against the evidence, and unsupported by any evidence; (2) that the jury misconceived the law given them by the court and neglected, failed, and refused to follow the law as given; (3) that the jury failed to base the damages upon the evidence and failed to consider the evidence in mitigation of damages; (4) that the verdict was governed by, based upon, and influenced by bias, passion, and prejudice. The motion specifies with particularity, under these general grounds, very many reasons why the verdict should be set aside. Among these were claims that plaintiff's counsel transcended the limits of legitimate argument and appealed to the passions and prejudices of the jury; that the charge failed adequately to caution the jury against the influence of the argument of plaintiff's counsel calculated to excite passion and prejudice; that from the inception of the suit, the community was intensely partisan in favor of the plaintiff and crowded the court room at nearly all times, by reason of which the jury, both in and out of the court room, were subjected to an atmosphere of hostility to the defendants and their cause and of sympathy for the plaintiff; that the jury were improperly influenced by the wealth of the defendants, especially of the defendant L. E. Woodhouse; that popular approval of the sentiments of plaintiff's attorney was emphatically expressed by the audience to the jury in the presence of the court, particularly by an outburst of applause at the close of his final argument.

The court found in their finding of facts, made part of the record that there was no bias, passion, or prejudice which entered into the verdict, and state therein, that, in reaching this conclusion, they had considered all of the circumstances and incidents of the trial, including the amount of the verdict and the questions asked by the jury upon their return for instructions. The court disposed of this phase of the motion by saying: "So far, then, as this motion proceeds upon the ground that the verdict is the result of passion and prejudice, it is denied." Passing to the question whether the verdict was against the evidence,

or without any supporting evidence, and was contrary to the
instructions of the court, the court held there was evidence upon
which the jury were justified in reaching a plaintiff's verdict,
and therefore ruled that so far as the motion attacks the finding
as to liability, it was not sustained.

Taking up the question whether the finding as to damages
was open to the foregoing objections, the court stated the rules
governing such questions, including the rule that, in order to
justify the granting of the motion, it must appear that the
award of damages is grossly out of proportion to the evidence
of the injuries sustained, and that there is no reasonable basis
therein for the finding of the jury upon the subject of damages.
The evidence on the question of damages was viewed somewhat
in detail in connection with defendants' claims with reference
thereto.   The conclusion reached was that the verdict, both as
to compensatory and exemplary damages, was excessive.   The
language of the finding follows: ''We clearly see that the sum
of $465,000 is grossly in excess of what the jury might reason-
ably award in this case.   As we stated, we do not find this ver-
dict is the result of passion, prejudice, bias or any improper
motive.   But we do consider that the jury have mistakenly
allowed a sum which is much greater than that which is war-
ranted by the evidence upon this subject.''

The defendants insisted that the verdict should be set aside
and a new trial granted—that a *remittitur* should not be ordered.
However, the court found that the sum of $100,000 compensatory
damages was reasonable and not excessive, and the minimum
sum which the jury, under a proper view of the evidence and
the law, could reasonably be expected to allow; and that in re-
gard to punitive damages, $25,000 was such a sum.   The plain-
tiff was given a limited time within which to remit the excess of
the verdict, over and above the sums named, whereupon the
motion to set the verdict aside was to be overruled.   The alterna-
tive order was that the verdict should be set aside and a new
trial granted on the question of damages only.   The defendants
excepted generally, on the ground that they were entitled to
have the verdict set aside and a new trial granted, and specially
on 29 distinct grounds of claimed error, all of which, save one,
are separately argued in their brief.   The plaintiff exercised
the option of filing the *remittitur,* whereupon judgment was
entered against both defendants for $125,000 damages to which

the defendants severally excepted, both generally and specially, on the ground that it was error to permit the *remittitur* and sustain the verdict as reduced.

[86]    The really vital question raised by these exceptions is whether the disposal of the motion resulted from the court's failure to exercise the discretion invoked or was in legal contemplation an abuse of discretion.   In substance the claims are these:    That the court neglected to consider certain circumstances bearing on the question of whether the verdict was the result of passion and prejudice; that by the circumstances in fact considered it conclusively appeared that the verdict was thus tainted and should be set aside; and it being found that the amount of the verdict was grossly excessive, that there was no proper basis for determining the sums to which it was ordered the damages should be reduced to avoid setting aside the verdict. Some incidental questions are argued, but the substantial grounds of complaint are embraced within these claims.   As the questions arise on exceptions to the findings and rulings of the court below, the scope of the inquiry is limited to a review of claimed legal errors, and we are bound to indulge every reasonable presumption in support of the action of the trial court.

[87]    By several exceptions to the findings, the defendants assert that the court failed to consider, among other things, argument of plaintiff's counsel of an objectionable character, though not excepted to, which in its nature was calculated to arouse the sympathy of the jury and to excite their passions and prejudices.   The claimed omission is based upon the reference in the findings to the fact that some of the argument was not objected to, coupled with the statement that, so far as their objections were not sustained, the defendants were protected by their exceptions, and that, in regard to such portions as were not objected to, the objection came too late.   It is doubtless the rule that the absence of an exception to prejudicial argument prevents the raising of the issue of its impropriety as a matter of law.   However, this does not deprive such argument of evidentiary value upon the issues raised by the motion to set the verdict aside.   *Moulton* v. *Langley*, 81 N. H. 138, 124 Atl. 70. It was the duty of the court to consider the probable effect of inflammatory argument, if such there was, together with all the other circumstances of the trial tending to account for the size of the verdict, and particularly such as bore upon the question

whether any improper motive affected the assessment of damages. The trouble with defendants' position respecting this, and similar claims, is that the failure complained of does not affirmatively appear. While certain statements in the findings, like that referred to above, might imply what the defendants infer, the direct statement that the conclusion reached respecting the absence of passion and prejudice was, upon consideration, "of all the circumstances and incidents of the trial," leaves no room for the inference relied upon. It fairly appears from the findings that all of defendants' claims on the motion to set the verdict aside were given consideration; hence, we do not find it necessary to examine the exceptions in detail relating to the claim that the court erred in that regard.

[88, 89] Other exceptions are directed to the proposition that the court erred in holding the verdict was not the result of bias, passion, or prejudice. The defendants recognize that the motion to set the verdict aside was addressed to the legal discretion of the trial court and that its action is only reviewable for failure to exercise such discretion, or for what amounts in law to abuse of discretion. *Sharby* v. *Town of Fletcher*, 98 Vt. 273, 127 Atl. 300; *Platt, Admx.* v. *Shields & Conant*, 96 Vt. 257, 270, 119 Atl. 520; *Dyer* v. *Lalor*, 94 Vt. 103, 114, 109 Atl. 30. These exceptions being addressed to a finding of fact by the court below, the question presented is not how we might regard the fact to be on a review of the evidence; but to justify this Court in sustaining such exceptions, it must appear to us, from the record, that there is no reasonable basis therein for the finding. *Platt, Admx.* v. *Shields & Conant, supra,* at p. 272. Besides, it should not be overlooked that the trial court is in better position to determine the question, so that its determination should ordinarily be accepted. See *Gila Valley, etc., R. R. Co.* v. *Hall,* 232 U. S. 94, 58 L. ed. 521, 526, 34 Sup. Ct. 229.

[90] Defendants advance the claim that passion and prejudice are conclusively shown by the size of the verdict alone. But we are not convinced that this is necessarily so. There have been cases where the verdict was so grossly out of proportion to the injury that, looking to all the circumstances, it could not be accounted for otherwise than as the result of passion and prejudice. It has been said that an excessively large verdict, in the absence of any other explanation, may be treated as *prima facie* evidence that the jury was not unprejudiced, fair, and

impartial. *Beach* v. *Bird, etc., Lumber Co.,* 135 Wis. 550, 116, N. W. 245. But the decisions all show that, in passing upon the question, the court must take into account all the circumstances of the case. There is no presumption of wrongdoing. It is well known that juries frequently err in awarding damages when there is no ground for claiming that they were influenced by improper motives. More often, this is so where the damages are left to be estimated by the jury, with no definite basis for computation in the evidence. It is frequently observed that, where juries are required to estimate the damages, it is not to be wondered at that their verdict should vary from the estimate of others, including the court. Hence, the fact that the court did not `agree with the jury, but made a large reduction in their award, would not, as the defendants contend, be unmistakable evidence of passion and prejudice. Especially would this be so when the court was called upon to fix the minimum amount of damages which the jury could reasonably be expected to allow.

[91-94] We think it cannot be said that the record discloses no reasonable basis for the finding that the verdict was not the result of passion and prejudice. It is true, as pointed out by the defendants, that the verdict exceeds the total of thirty-nine verdicts rendered in actions of this nature during the past twenty-five years that have been attacked for excessiveness. This fact, as the court below well said, is worthy of serious consideration; but it is not conclusive. Each case must stand upon its own facts, and the evidence in this case, bearing on the question of damages, clearly places it in a class by itself. Plaintiff and her husband were in the prime of life, and, but for the alienation, there was every reasonable prospect of many years of marital happiness. Her husband was possessed of an independent fortune at the time of the alienation, amounting, at least, to $75,000. He was a man of culture, a graduate of Columbia Law School, and had had several years' experience in banking. The principal item of the damage, which the jury were required to estimate, was how much would make the plaintiff whole for the permanent loss of consortium in such circumstances. It is not unlikely that they arrived at the sum awarded for compensatory damages by capitalizing what they regarded as the annual loss at some low rate of interest and adding thereto such sums as they allowed for other elements of damage. This seems probable from the fact that plaintiff's counsel argued along that line.

Besides, it cannot be said that the award of $65,000 exemplary damages, could not be accounted for except as the result of passion and prejudice, or the unwarranted use of the evidence of L. E. Woodhouse's wealth. In a case admitting the allowance of exemplary damages, the amount of such allowance is largely discretionary with the jury. In determining what would be a just punishment, there must be taken into account the character and standing of the defendants (*Goldsmith's Admr.* v. *Joy*, 61 Vt. 488, 17 Atl. 1010, 4 L. R. A. 500, 15 A. S. R. 923), the malice or wantonness of the act for which they are found guilty (*Boardman* v. *Goldsmith*, 48 Vt. 403), as well as the financial standing of the least wealthy defendant. Hence, the fact that exemplary damages were allowed, in excess of the individual wealth of Mary Woodhouse, is not controlling. In disposing of this phase of the motion, it would be the duty of the trial court to consider the view of the evidence most favorable to the plaintiff. As the record discloses a reasonable basis for the conclusion reached by the trial court, we are not at liberty to disregard their finding that the verdict was not the result of bias, passion, or prejudice.

In the discussion of this phase of the motion, the court observed that, if the verdict was the result of bias, passion, or prejudice, the defendants would be entitled to a new trial, as a matter of right, adding, "the burden is upon the defendants to show that it was so influenced." The defendants brief an exception taken to the quoted part of the statement. The question is of no practical importance in the circumstances of this case. The finding is not based upon any presumption or the lack of evidence, but upon consideration of all the circumstances and incidents of the trial. The court considered each circumstance relied upon as improperly influencing the jury, such as the amount of the *ad damnum*, the argument of counsel, the manifestations of sympathy on the part of the spectators, the outburst of applause at the close of the final argument, and stated, in effect, that they found no reason to believe that the jury were influenced thereby, or by any motive except a conscientious desire to decide the case upon the evidence.

[95]    When considering the effect of the applause by the spectators, the court stated the rule of law governing such a situation to be that a demonstration of spectators in a court room is not sufficient reason for granting a new trial, unless it appears that the rights of the parties were prejudiced thereby.

The defendants argue an exception taken to the statement, claiming that the rule is not applicable to this case. It would seem to require no argument to support the proposition that the defendants could not be heard to complain of such misconduct unless they were harmed thereby. The cases relied upon in support of the exception relate to the misconduct of jurors, where it was held that the verdict should be set aside upon grounds of public policy. Defendants' objection that the findings with respect to the applause are inadequate, merits only passing notice. It does not appear that the court was asked to make any additional findings, and, besides, the findings made seem to give an accurate picture of that incident.

[96, 97] We come to the question whether the court erred in overruling the motion to set the verdict aside upon condition that the plaintiff should remit the part thereof found to be excessive. On this question the defendants are forced to rely upon the claim that the court's action was an abuse of discretion. We can most profitably consider at the outset, what our practice permits by way of the reduction of excessive verdicts in cases of this character. One phase of the question has recently been before the Court in *Smith* v. *Martin*, 93 Vt. 111, 106 Atl. 666. That was an action of tort for deceit in the sale of certain shares of the capital stock of a corporation. The defendant brought up an exception to the action of the trial court in denying his motion to set the verdict aside on the ground that the damages were excessive. The question considered was whether the refusal of the motion was a proper exercise of judicial discretion. The conclusion reached from an examination of the evidence bearing upon the question of damages was that a manifest injustice would result, if the verdict was allowed to stand. The rule of damages in the case was the difference between the actual value of the stock and its value as represented. The verdict was for $4,398.90 damages, while it appeared by mathematical calculation, based on the evidence most favorable to the plaintiff, that the difference in value did not exceed $1,400.00. Speaking of the power of the trial court to grant a *remittitur* in such circumstances, it was said that the thing to be guarded against was the danger of injustice to the defendant by forcing upon him an excessive judgment, when the excess in the verdict could not be accurately determined. It was pointed out that that danger could be avoided by fixing the amount, on the acceptance

of which, by the plaintiff, a new trial would be denied, at the minimum sum which a jury could reasonably be expected to allow, and which the court could clearly see was not excessive. In the Smith case the law fixed the measure of damages, and the evidence afforded the means of ascertaining the excess in the verdict with a reasonable degree of accuracy, but it is plainly intimated in the opinion that the power to grant a *remittitur* is not confined to cases where it is possible to determine what the verdict should have been with certainty, as by computation.

[98] In those cases where there is no legal measure of damages, and they are unliquidated so the amount thereof is referred to the judgment and legal discretion of the jury, the court ordinarily will not interfere with their verdict, unless it clearly appears that the damages found are excessive or insufficient. Although the verdict may be considerably more or less than, in the judgment of the court, it ought to have been, still it will decline to interfere unless the amount is so great or small as to indicate that it is the result of perverted judgment, accident, or gross mistake. When the verdict is thus excessive or deficient, the court will not hesitate to exercise its discretion to interfere. 2 Sutherland on Dam. § 459. It has been said that courts have been reluctant to reduce even excessive verdicts in actions for alienation of affections because of the lack of any rational basis upon which to fix the proper amount. *Phillips* v. *Thomas,* 70 Wash. 533, 127 Pac. 97, 42 L. R. A. (N. S.) 582, Ann. Cas. 1914B, 800. See, also, note L. R. A. 1915F, 30, 34.

The view that the trial court may not allow *remittiturs* where there is no basis of computation obtains in some jurisdictions. It is the modern doctrine in England where the contrary view prevailed before the decision in *Watt* v. *Watt,* 1905 A. C. 115, 2 Ann. Cas. 672; and is still adhered to in some jurisdictions in this country, including Colorado, Georgia, Kentucky, South Dakota, and West Virginia. But the tendency of the late decisions of the courts of the other states is in the direction of unqualified support of the practice which allows both the trial and appellate courts, in cases where the plaintiff is entitled to substantial damages and excessive damages have been awarded, to indicate the excess and give him the option to remit and take judgment for the residue or submit to a new trial, regardless of whether the excess is capable of computation or not. This prac-

tice will be found to be supported by the decided weight of au-
thority. For the cases see note 39 L. R. A. (N. S.) 1067; 20
R. C. L. 317; note 2 Ann. Cas. 675; 4 C. J. 1139. Among the
leading cases on the subject are *Northern Pac. R. R. Co.* v. *Her-
bert,* 116 U. S. 642, 29 L. ed. 755, 6 Sup. Ct. 590, and *Arkansas
Valley Land & Cattle Co.* v. *Mann,* 130 U. S. 69, 32 L. ed. 854,
9 Sup. Ct. 458. In the former case, which was an action for
personal injuries, the verdict was for $25,000, and a new trial
had been ordered unless the plaintiff should remit $15,000 of
the verdict. The *remittitur* was filed, and judgment was entered
for the remainder. In sustaining this action the Court said:
''The exaction, as a condition of refusing a new trial, that the
plaintiff should remit a portion of the amount awarded by the
verdict, was a matter within the discretion of the court. It
held that the amount found was excessive, but that no error
had been committed on the trial. In requiring the remission of
what was deemed excessive, it did nothing more than require
the relinquishment of so much of the damages as, in its opinion,
the jury had improperly awarded. The corrected verdict could,
therefore, be properly allowed to stand.''

The question was re-examined at length in the Mann case,
an action of trover, in which the trial court had overruled a
motion for a new trial upon the condition, accepted by the plain-
tiff, that nearly two-thirds of a large verdict should be remitted.
Mr. Justice Harlan · delivered the unanimous opinion of the
Court. After reviewing the cases he said: ''The practice which
this court approved in *Northern Pac. R. R. Co.* v. *Herbert* [116
U. S. 642, 29 L. ed. 755, 6 Sup. Ct. 590], is sustained by sound
reason and does not, in any just sense, impair the constitutional
right of trial by jury. It cannot be disputed that the court is
within the limits of its authority when it sets aside the verdict
of the jury and grants a new trial where the damages are pal-
pably or outrageously excessive. [Cases cited.] But, in con-
sidering whether a new trial should be granted upon that ground,
the court necessarily determines, in its own mind, whether a
verdict for a given amount would be liable to the objection that it
is excessive. The authority of the court to determine whether the
damages are excessive implies authority to determine when they
are not of that character. To. indicate, before passing upon the
motion for a new trial, its opinion that the damages are excessive,
and to require a plaintiff to submit to a new trial, unless, by re-

mitting a part of the verdict, he removes that objection, certainly does not deprive the defendant of any right, or give *him* any cause for complaint." Whether the verdict should be entirely set aside upon the ground that it was excessive, or should stand after being reduced to such amount as would relieve it of the imputation of being excessive, were held to be questions within the discretion of the court which could not be reviewed at the instance of the party in whose favor the reduction was made. The doctrine of these cases was re-affirmed in *Gila Valley, etc., R. R. Co.* v. *Hall,* 232 U. S. 94, 58 L. ed. 521, 34 Sup. Ct. 229. An extended review of the decisions is unnecessary, as the law of the subject is fully covered by the cases already referred to.

[99, 100] The trial court having found that the verdict was so excessive as to require its interference, and that it was not the result of passion or prejudice, it was a proper case for the correction of the verdict by *remittitur.* Whether its action should be upheld on review leads to the further question whether the sums to which the damages were remitted were still excessive or, stated more exactly, were so excessive as to justify the interference of this Court. This involves, as we have seen, the question of abuse of discretion. In such actions, what would be reasonable damages is necessarily a matter of judgment to be estimated from all the facts and circumstances in the case. *Capital Garage Company* v. *Powell,* 98 Vt. 303, 127 Atl. 375. The rule as to what amount should be remitted to avoid a retrial because of an excessive verdict in cases where there is no definite measure or standard for fixing the amount of damages, has been variously stated: "The basis of the action of the court, in this respect, will be to place the sum at such a figure as, in every reasonable probability, any future jury, rightly instructed as to the law and, with the proper conception of duty, would be liable to award." *Willette* v. *Rhinelander P. Co.,* 145 Wis. 537, 130 N. W. 853. "The amount remitted shall be large enough to strip the verdict of any prejudicial elements, giving the defendant the benefit of reasonable probabilities in respect to the amount of the recovery, so that it shall clearly be regarded as not excessive." *St. Louis, etc., R. R. Co.* v. *Brown,* 100 Ark. 107, 140 S. W. 279; 2 Sutherland on Dam. § 460, p. 1512. "The largest amount which, in the court's judgment, would not be excessive." *Canfield* v. *Chicago, etc., R. R. Co.,* 142 Iowa 685, 121 N. W.

186. "The rule is * * * to reduce the verdict to a sum which in the judgment of the court would be reasonable and just." *Cook* v. *Globe Pr. Co.*, 227 Mo. 471, 561, 127 S. W. 332, 359. "The amount" named should be "as low as an impartial jury on the evidence would probably name." *Gerlach* v. *Gruett,* 175 Wis. 354, 185 N. W. 195, 18 A. L. R. 1155. "The lowest amount the evidence would warrant." *Mullins' Lumber Co.* v. *Williamson & Brown Land & Lumber Co.*, 255 Fed. 645, 167 C. C. A. 21. The rule generally followed is, in substance, that stated in *Smith* v. *Martin, supra,* which the trial court, in effect, adopted as the guide of its action in determining what would not be an excessive recovery, *viz.*, the minimum sum which a jury could reasonably be expected to allow, and which the court can clearly see is not excessive.

[101, 102] Should this Court, in the exercise of its revisory power, reverse the action of the trial court in disposing of the motion to set the verdict aside? Admittedly not, unless abuse of discretion is shown by the record. As to this, the recognized test is whether the discretion of the court has been exercised on grounds or for reasons clearly untenable, or to an extent clearly unreasonable. *Dyer* v. *Lalor,* 94 Vt. 103, 116, 109 Atl. 30; *New England Box Co.* v. *Tibbetts,* 94 Vt. 285, 290, 110 Atl. 434. The ultimate question being whether the sums fixed by the court to which the damages have been reduced were themselves excessive, the rule applies that this Court will interfere only when the award of the lower court is manifestly and grossly excessive. *Platt, Admr.* v. *Shields & Conant,* 96 Vt. 257, 270, 119 Atl. 520. This principle has been applied where the question was like that in the case at bar. It is said in *Pensacola Sanitarium* v. *Wilkins,* 68 Fla. 447, 67 So. 124, that, where a *remittitur* has been allowed, a judgment will not be reversed for excessiveness not clearly apparent; again, in *Detzur* v. *B. Stroh Brewing Co.,* 119 Mich. 282, 77 N. W. 948, 44 L. R. A. 500, that it has always been a matter of discretion to grant a portion of the relief asked by requiring a remission of a portion of the verdict as a condition upon which the new trial will be denied; and that, where it is not clearly erroneous, the action of the trial court will not be disturbed.

[103] We note, in passing, certain claims respecting the allowance of exemplary damages. An exception was taken to the order of the court permitting the verdict to stand to the

amount of $25,000 on account of punitive damages, on the ground that there is no basis in law and in fact for the award of punitive damages in this case. This exception presents a question not raised by the motion, which proceeds upon the theory that the amount of punitive damages awarded by the jury was excessive, and does not object that the allowance of any exemplary damages was unwarranted. The defendants argue at some length that in this state the "punitive principle" is not involved in the assessment of exemplary damages. The cases relied upon in support of this proposition only hold that exemplary damages are not given in lieu of punishment, and so the payment of such damages in a civil action founded on a criminal act would not bar a criminal proceeding for the same act. *Hoadley* v. *Walton,* 45 Vt. 289, 12 A. R. 197; *Roach* v. *Caldbeck,* 64 Vt. 593, 24 Atl. 989; *Dubois* v. *Roby,* 84 Vt. 465, 80 Atl. 150. Our cases, including those relied upon by the defendants, show that exemplary damages are allowed in part in the nature of punishment. See *Rea* v. *Harrington,* 58 Vt. 181, 188, 2 Atl. 475, 56 A. R. 561; *Earl* v. *Tupper,* 45 Vt. 275, 286. Other exceptions not specially noticed are sufficiently covered in the opinion.

[104] Upon consideration of all the evidence bearing on the question of damages, we are not satisfied with the certainty contemplated by our rule that the action of the court on the motion to set the verdict aside was not a proper exercise of its discretion. None of the exceptions to this point can be sustained.

The record in this case is unusual for its length and the number of exceptions taken at the trial. It has not been found possible to treat them all within the reasonable limits of an opinion. We have carefully reviewed all of the assignments of error that are briefed, and have discussed as many of them as seemed to require special attention. No reversible error is found in the record of the trial. It remains to consider the petition for a new trial, which is an original petition to this Court.

## PETITION FOR A NEW TRIAL

The ground of the petition for a new trial is the misconduct of certain jurymen in talking about the case during the trial in violation of their oath as jurors. It is alleged as the chief ground of complaint that after the case was partly heard and before the testimony for the defense had been adduced, Burr D. Martin

of Milton, who served as foreman of the jury, expressed an opinion as to the outcome of the trial, in this, that he stated to and in the presence of Irving S. Coburn and his wife, Lottie A. Coburn, both then residing at Milton, the opinion that the plaintiff ought to prevail and ought to recover a large amount of damages, and that she would so prevail and would so recover. It is alleged as an additional ground of complaint that early in the trial Clark B. Paige of Westford, another juryman, expressed to Joseph A. Brunell, then of Milton, the opinion that the plaintiff "would get her money, that is, would recover damages of the defendants and that she had conducted herself on the stand like a lady." It is further charged that juryman Paige suffered Brunell to talk with him about the case at length and to express to him the opinion that the plaintiff would recover. The prayer of the petition is that a new trial may be granted if, upon the determination of the pending exceptions, it shall be determined that any question for the jury was presented on the trial as against either of the defendants.

Among the supporting affidavits appended to the petition are the affidavits of Mrs. Coburn and Mr. Brunell. In substance, the former affirms that during the trial of the Woodhouse case on an occasion some two or three weeks before the end of the trial, the juryman Martin called at her house and visited with her and her husband, Dr. Coburn, since deceased; that on that occasion Martin "expressed the opinion and confidence that the plaintiff ought to and would recover a large verdict in said cause,"—that she could not state his exact words, "but that was the substance of what he said as to his opinion and expectation." Brunell states in his affidavit that he was in Burlington on an occasion during the Woodhouse trial and heard some of the evidence; that he rode to Westford that night with juryman Paige; that he talked to Paige considerably about the case at intervals most of the way home; that Paige did not say very much; that affiant remembered saying, "I guess she will get her money, won't she?" To which Paige replied, "I guess so"; that affiant asked Paige how he thought plaintiff appeared on the stand and the latter replied, "Like a lady." Pursuant to an order of court, testimony in support of the petition and by way of defense was taken before a commissioner as in the form of depositions. The transcript of the proceedings before the commissioner has, by agreement of the parties, been filed in lieu of

formal depositions, which they stipulate shall be treated as a compliance with the order.

[105]    A controversy arose before the commissioner respecting the use to be made of the affidavits annexed to the petition. Brunell was being examined as a witness for the defendants. He had testified to being in court on an occasion during the trial and to riding to Westford with juryman Paige after adjournment that day, and that he had conversation with Paige on the way about court affairs, particularly about what happened that day.  Continuing the direct examination the following occurred:

"Q.  Well, now tell us about that conversation.

A.  Why, I asked him if she was going to get her money. Said he didn't know.

Q.  Did he tell you what he thought about it, or anything of that?

A.  Not that I remember of.

Q.  Said he didn't know.  Was anything else said about it?

A.  I asked him how she appeared on the stage, he says like a lady.                            •

Q.  Well, about the money.  Did he say anything else than that he didn't know?

A.  Not that I recollect."

Thereupon the examiner showed the witness his affidavit annexed to the petition, and having proved the signature thereto and called attention to certain portions of the affidavit renewed the inquiry as to what Paige said when asked if he thought plaintiff would get her money.  The witness then answered: "I asked him if she would get her money and he said, 'I guess so'." This procedure was objected to as an improper use of the affidavit and plaintiff's counsel insists that the testimony elicited thereby should be rejected.  It is admitted in plaintiff's brief that this is a discretionary matter, but it is urged that where the instrument employed to refresh the recollection is an *ex parte* affidavit its use enables counsel to suggest the answer desired, and besides defeats the object of taking the evidence by depositions, as it amounts to no more than letting the affidavit be used as testimony.  Notwithstanding the petition is addressed to the discretion of the Court, the admission and rejection of evidence upon such a petition must be governed by ordinary legal rules. *Woodward* v. *Leavitt*, 107 Mass. 453, 9 A. R. 49.  That the use of the affidavit was in the circumstances justified is shown by

*Lapham* v. *Kelly*, 35 Vt. 195; *Davis* v. *Field*, 56 Vt. 426; *Mahoney's Admr.* v. *Rutland R. R. Co.*, 81 Vt. 210, 69 Atl. 652; *Taplin & Rowell* v. *Clark*, 89 Vt. 226, 232, 95 Atl. 491.

[106]    A somewhat similar question was raised during the direct examination of Mrs. Coburn called as a witness by the defendants.    Early in the examination her affidavits annexed to the petition were submitted for identification.    After showing by the witness that juryman Martin took part in a conversation about the case with herself and Dr. Coburn, she was asked to state what that conversation was.    At the same time the examiner handed the witness the affidavits, saying, "And for purpose of refreshing your recollection, if you like to, you may look to this paper that I have shown you."    Plaintiff's counsel objected to this method of examination, claiming that it was not her writing and that counsel had no right in this proceeding to undertake to get witness to repeat what they had put into the paper.    In spite of repeated protests, the witness examined the affidavits before answering the question.    It must be admitted that no sufficient reason for the use made of the affidavits appeared when they were first shown to the witness; but it soon appeared that she was at least a very reluctant witness.    In the circumstances, we think her testimony elicited in connection with the affidavits should not be rejected.

[107, 108]    It is the undoubted rule that applications for a new trial on the ground of misconduct of jurors are addressed to the sound discretion of the Court.    The inquiry necessarily involves matters of fact, and no general rules can be laid down. The question whether the ends of justice and the purity of jury trials require a new trial to be granted in a particular case must be determined upon its own particular facts.    *Downer* v. *Baxter*, 30 Vt. 467, 474.    It is said in *Re Ketchum*, 92 Vt. 280, 102 Atl. 1032, that such an application must fail or prevail according to the strength of its appeal to the judgment and conscience of the court; and, in *Ryan* v. *Rooney*, 88 Vt. 88, 90 Atl. 891, that the reason for granting a new trial must be collected from the whole evidence and from the nature of the case considered under all of its circumstances.    Such is the comprehensive scope of the inquiry. ⸱ It involves not only the determination of disputed facts, but the presence or absence of probable injury to the defeated party through the misconduct complained of; whether either the parties, their attorneys or their friends were impli-

cated in such misconduct; and generally, the underlying question of public policy—the due administration of justice. The following additional cases illustrate the application of these principles: *Dennison* v. *Powers,* 35 Vt. 39; *Carlisle* v. *Town of Sheldon,* 38 Vt. 440; *McDaniels* v. *McDaniels,* 40 Vt. 363, 94 A. D. 408; *Winslow* v. *Campbell,* 46 Vt. 746; *Clement* v. *Spear,* 56 Vt. 401; *State* v. *Lawrence,* 70 Vt. 524, 41 Atl. 1027; *McCarger* v. *Langlois,* 81 Vt. 223, 69 Atl. 739; *Norcross* v. *Willard,* 82 Vt. 185, 72 Atl. 820; *State* v. *Warm,* 92 Vt. 447, 105 Atl. 244, 2 A. L. R. 811; *Hannah* v. *Hannah,* 96 Vt. 469, 120 Atl. 886.

[109, 110]   We come to the examination of the evidence bearing upon the issues raised in the petition. In the light of what already appears, it should be seen that the defendants have failed to establish the alleged misconduct of juryman Paige. Theirs is the burden of proof on that issue. The contradictory statements of Brunell are met by the direct and positive denial of Paige, whose testimony is unshaken. In the circumstances, the unsupported testimony of Brunell is not a sufficient basis for a finding of misconduct on the part of this juryman. It is not the satisfactory proof which the law requires. *Thrall* v. *Lincoln,* 28. Vt. 356; *Flint* v. *Holman,* 82 Vt. 513, 517, 74 Atl. 232; *State* v. *Warm,* 92 Vt. 447, 105 Atl. 244, 2 A. L. R. 811.

The testimony respecting the conduct of juryman Martin presents a more doubtful situation. It is evident that Doctor and Mrs. Coburn took an active interest in the case during the trial. They were not acquainted with either of the parties, but manifestly their sympathies were strongly with the plaintiff. Mrs. Coburn's testimony before the commissioner is to be weighed in the light of this fact. She was a reluctant witness for the defendants, which makes weight for such testimony as she gave favorable to them; but it will be necessary to distinguish carefully between fact and opinion, as the latter may easily, though unconsciously, be affected by her prejudice.

It appears that Mr. Martin and Dr. Coburn were neighbors and intimate friends. Martin had occasion to call at Dr. Coburn's house twice on business during the Woodhouse trial, the first time early in the trial, and the other about two or three weeks before the trial· ended. It was on the latter occasion that it is claimed the alleged misconduct occurred. With reference to the first visit, Martin testified that Dr. Coburn inquired how he happened to get onto the jury, and that he explained how

he tried to get excused; that he said nothing about the facts in the case, and did not express any opinion in regard to its outcome—then had no opinion with reference to that matter; that just as he was leaving Dr. Coburn said, referring to plaintiff's counsel, "Warren is worried about you"; and that he replied, "He no need to be worried about me. He and I have always been good friends just the same as the rest of them have," meaning the attorneys for the defendants. Mrs. Coburn testified that she was not present during the first interview, and overheard only Dr. Coburn's remark and Martin's reply quoted above. Her testimony respecting this conversation is substantially the same as Martin's. The only significance attached to this evidence is its claimed relation to a telephone communication from Dr. Coburn the last day of the trial. It appears that Dr. Coburn called Mr. Austin about eight o'clock that morning and held a conversation in which, according to Mrs. Coburn's testimony, Dr. Coburn said "something like he needn't worry, everything was all right up here." It appears in this connection that Mr. Austin had been employed by parties interested in a ferry project, and the day before had written Dr. Coburn, a senator elect, respecting that matter. Mr. Austin testifies that the telephone conversation related to the ferry project and not to the Woodhouse Case or any juror in the case; that after friendly salutations Dr. Coburn asked how he was physically, spoke of the strain that he was under, and inquired how he was enduring it; that he then said, "I have your letter. Everything is all right here. You need not add that to your worries." This testimony is supported by corroborative evidence, and clearly disposes of any suspicion even that Dr. Coburn was attempting to communicate the result of any interview with juryman Martin.

The occasion of Martin's second call related to a scholarship in the University of Vermont. In substance, Martin testifies that the doctor was reading the newspaper when he went in; that Mrs. Coburn was present; that Dr. Coburn said they were just reading the trial and asked how we were getting along; that witness replied that it was coming mighty slow; that the doctor asked if they had got most through; that witness said they had not—that it would probably take two or three weeks longer anyway; that nothing else was said in connection with the Woodhouse case; that neither the doctor nor Mrs. Coburn

expressed any opinion about how the case was coming out; and that witness did not express to them any such opinion, and particularly did not express ''the opinion and confidence that the plaintiff ought to and would recover a large verdict.'' In cross-examination Martin admits having said, when informed concerning the contents of Mrs. Coburn's affidavits, ''I don't remember anything about it. They can go to hell.'' Other than this his testimony was unaffected by the cross-examination.

It is somewhat difficult to generalize Mrs. Coburn's testimony. She testified in direct examination, referring to the occasion of Martin's second visit, that she and the doctor were talking about the Woodhouse case and that Martin joined in the conversation; that Martin didn't say so very much, she and the doctor doing the most of the talking. When asked to state what the conversation was after examining her affidavits, she replied: ''I cannot do any different than to read it just as it is here,'' referring to the affidavits. Though pressed by repeated questions to give the substance of Martin's statements, she reiterated that she was unable to do so—that she could only state it as it appeared in the affidavit. Asked whether Martin said anything about the probable verdict, she replied: ''I suppose he must have''; but in this connection she testified that Martin did not say right out, ''I think she will get a verdict,'' or anything of that sort. In answer to one question, she testified she remembered the substance of what Martin said as stated in the affidavit, but, when her testimony is analyzed, the most the defendants succeeded in showing by her was that Martin talked about the matter in such a manner that she gathered the impression that he thought the plaintiff would get a verdict. It was pretty much all summed up in the following questions and answers:

''Q. Without stating any amount, you and Dr. Coburn were talking about whether the verdict would be a good-sized verdict or not, weren't you?

A. Why, we were talking about it in general, but what we said, I don't know.

Q. Did you talk about whether the verdict would be large or small?

A. Why, we probably did, because we naturally think it would be.

Q. Your sympathies were in that direction, weren't they?

A.   Yes.

Q.   And you expressed your view about it?

A.   Yes, expect we did.

Q.   And the Doctor expressed his views?

A.   Why, yes, I think so.

Q.   And Mr. Martin expressed his didn't he?

A.   Why, I don't know that he did right out say anything.

Q.   You understood that he agreed with you, didn't you, from that conversation?

A.   Why, we felt from what was said that probably was his opinion."

Mrs. Coburn testifies, in substance, that nothing was said in the affidavit that is not true.  In her cross-examination, she states, in effect, that she did not intend in the affidavit to give anything else but an impression of the effect of the general conversation, and that she might, perhaps, be mistaken in the impression that Martin had formed or expressed any opinion on the merits of the case.  In redirect examination, the fact is developed that Mrs. Coburn supposed, when giving her direct testimony, that she would not be permitted to answer in the language of the affidavit.  Thereupon she was asked:

"Q.   Now can you tell (it) in substantially the language of the affidavit (now) what the conversation was?

A.   Like what is in the affidavit?

Q.   Yes.

A.   Well, he expressed his opinion that she would get a verdict.

Q.   What kind of a verdict, large or small?  Tell it in your own language.  Tell it in any language, Mrs. Coburn.  The language of the affidavit, if that is good enough for you, you are permitted to.  You read the affidavit?

A.   Yes, I read it so many times —

Q.   Well, now let's have that.  Can you state it in any language in substance?

A.   Why, I don't believe I can.

Q.   Well, do the best you can.

A.   I can't.

Q.   You can't tell it any different than it is stated here?

A.   No."

Thus it is seen that the defendants have failed to show even the substance of what Martin said.  The most they are able to

show is Mrs. Coburn's impression gathered from undisclosed conversations (in other words her conclusion) that Martin expressed his opinion unfavorable to the defendants on the merits of the case. Her testimony being positive that Martin did not make anything like a direct avowal of such an opinion, it follows that Mrs. Coburn's impression of Martin's attitude may well have been colored, if not begotten, by her own state of mind. The evidence as a whole affords a very unsatisfactory basis for a finding of the misconduct alleged, namely, that Martin expressed the opinion that the plaintiff ought to and would prevail and recover a large amount of damages. Mrs. Coburn and Martin are the only witnesses to what occurred on the occasion in question. The dubious testimony of the former respecting the whole matter is met by the direct and positive denial of the latter that he expressed the opinion complained of, or any opinion as to how the case was coming out. It may be that Martin suffered Doctor and Mrs. Coburn to talk about the case in his presence, or further disregarded his oath as a juryman by taking part in the conversation, but such misconduct, reprehensible as it would be, is not made the basis of this petition. We are constrained to hold that the petition for a new trial is not sustained, in that there is not a sufficient basis in the evidence for a finding of the misconduct complained of.

*Judgment affirmed. Petition for new trial dismissed with costs.*

WATSON, C. J., concurs in the foregoing opinion in all respects except (a) the conclusion reached on the motion to set the verdict aside and (b) the disposition of the petition for a new trial. Respecting the former, he is of the opinion that the record shows the sums to which the verdict was reduced are so manifestly excessive as to be clearly unreasonable, and consequently the failure of the court to make such further reduction as was sufficient to relieve the verdict of such excessiveness was an abuse of discretion. As to the latter, he would find that the juryman Martin expressed the opinion set out in the petition, entitling the defendants to a new trial. In these two respects and to that extent he dissents.